**08-2899-cv**
**CSX Corp. v. The Children's Inv. Fund Mgmt.**

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2008

(Argued: August 25, 2008　　　　　　Decided: July 18, 2011)

Docket Nos. 08-2899-cv (L), 08-3016-cv (XAP)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CSX CORPORATION,
　　　　　Plaintiff-Appellant-Cross-Appellee,

v.

THE CHILDREN'S INVESTMENT FUND MANAGEMENT (UK) LLP,
THE CHILDREN'S INVESTMENT FUND MANAGEMENT (CAYMAN)
LTD., THE CHILDREN'S INVESTMENT MASTER FUND, 3G
CAPITAL PARTNERS LTD., 3G CAPITAL PARTNERS, L.P.,
3G FUND, L.P., CHRISTOPHER HOHN, SNEHAL AMIN, and
ALEXANDRE BEHRING, also known as Alexandre Behring
Costa,
　　　　　Defendants-Third-Party-Plaintiffs-
　　　　　Counter-Claimants-Appellees-Cross-
　　　　　Appellants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Before: NEWMAN, WINTER, and CALABRESI, <u>Circuit Judges</u>.

Appeal and cross-appeal from the June 11, 2008, judgment of the United States District Court for the Southern District of New York (Lewis A. Kaplan, District Judge), finding the Defendants in violation of section 13(d) of the Williams Act, 15 U.S.C. § 78m(d), and permanently enjoining them from future violations. *See CSX Corp. v. Children's Investment Fund Management (UK) LLP*, 562 F. Supp. 2d 511 (S.D.N.Y. 2008). The District Court deemed the Defendants to be the beneficial owners of shares of CSX Corp. purchased by short parties to cash-settled total-return equity swap agreements entered into by the Defendants as long parties. The District Court also found that the Defendants formed a "group" within the meaning of section 13(d)(3).

See 15 U.S.C. § 78m(d)(3). At this stage of the appeal, we consider only whether a section 13(d) violation occurred with respect to CSX shares owned outright by the Defendants acting as a group. Because the District Court did not make findings sufficient to permit appellate review of a group violation of section 13(d) with respect to outright ownership of CSX shares, we remand for further consideration. An earlier order affirmed the denial of an injunction against the voting of shares acquired by the Defendants while they were not in compliance with section 13(d). We explain that ruling on the ground that injunctive "sterilization" of shares is not available when shareholders had adequate time to consider the belated Williams Act disclosures before the relevant shareholders' vote.

Affirmed in part, vacated in part, and remanded in part. Judge Winter concurs in the judgment with a separate opinion.

RORY O. MILLSON (Francis P. Barron & David R. Marriott, on the brief), Cravath, Swaine & Moore LLP, New York, New York, for Plaintiff-Appellant-Cross-Appellee.

CHRISTOPHER LANDAU, P.C. (Patrick F. Philbin & Theodore W. Ullyot, Kirkland & Ellis LLP, Washington, D.C.; Peter D. Doyle & Andrew M. Genser, Kirkland & Ellis LLP, New York, New York; Howard O. Godnick & Michael E. Swartz, Schulte Roth & Zabel LLP, New York, New York, on the brief), Kirkland & Ellis LLP, Washington, D.C., for Defendants-Appellees-Cross-Appellants.

Adam H. Offenhartz, Aric H. Wu & J. Ross Wallin, Gibson, Dunn & Crutcher LLP, New York, New York, for Amicus Curiae Coalition of Private Investment Companies.

Richard M. Lorenzo, James G. Szymanski & M. Alexander Bowie II, Day Pitney LLP, New York, New York, for Amici Curiae Former SEC Commissioners and Officials and Professors.

Katherine Tew Darras & Rosario Chiarenza, International Swaps and Derivatives Association, Inc., New York, New York; Ira D. Hammerman & Kevin M. Carroll, Securities Industry and Financial Markets Association, Washington, D.C.; David M. Becker, Edward J. Rosen, Michael D. Dayan, Joon H. Kim & Shiwon Choe, Cleary Gottlieb Steen & Hamilton LLP, New York, New York & Washington, D.C., for Amici Curiae International Swaps and Derivatives Association, Inc., and Securities Industry and Financial Markets Association.

Roger D. Blanc, Martin Klotz & Richard D. Bernstein, Willkie Farr & Gallagher LLP, New York, New York, for Amicus Curiae Managed Funds Association.

Daniel J. Popeo & Richard A. Samp, Washington Legal Foundation, Washington, D.C., for Amici Curiae Washington Legal Foundation, National Association of Manufacturers & Business Roundtable.

JON O. NEWMAN, Circuit Judge:

This case comes to us raising issues concerning a contractual arrangement known as a "cash-settled total return equity swap agreement" although our disposition at this stage of the appeal touches only tangentially on such issues.

The Children's Investment Fund Management ("TCI") and 3G Capital Partners ("3G")[1] are hedge funds that entered into cash-settled total-

---

[1]The District Court described TCI and 3G as follows:

Defendants [are] The Children's Investment Fund Management (UK) LLP . . .[,] The Children's Investment Fund

–3–

return equity swap agreements referencing shares of CSX Corporation ("CSX"). They later sought to elect a minority slate of candidates to CSX's board of directors. Alleging that TCI and 3G ("the Funds") had failed to comply in a timely fashion with the disclosure requirements of section 13(d) of the Williams Act, 15 U.S.C. § 78m(d), CSX brought the present action. It sought injunctions barring the Funds from any future violations of section 13(d) and preventing the Funds from voting CSX shares at the 2008 CSX annual shareholders' meeting.

The District Court held that the Funds had violated section 13(d) and granted a permanent injunction against further such violations with respect to shares of any company. *See CSX Corp. v. Children's Investment Fund Management (UK) LLP*, 562 F. Supp. 2d 511, 552, 554-55, 573-74 (S.D.N.Y. 2008) ("*CSX I*"). However, the Court declined to enjoin the Funds from voting their CSX shares. *See id.* at 568-72. CSX appealed the denial of the voting injunction; the Funds cross-appealed the granting of the permanent injunction. On September 15, 2008, we affirmed the District Court's denial of the voting injunction. *CSX Corp. v. Children's Investment Fund Management (UK) LLP*, 292 F. App'x

_____

Management (Cayman) LTD[,] . . . . [and] The Children's Investment Master Fund . . . . These entities are run by defendant Christopher Hohn . . . . Defendant Snehal Amin is a partner of [The Children's Investment Fund Management (UK) LLP]. These five defendants are referred to collectively as TCI.

Defendants [are] 3G Fund L.P. . . . [,] 3G Capital Partners L.P. . . . . [and] 3G Capital Partners Ltd. . . . . They are run by defendant Alexandre Behring . . . . These four defendants are referred to collectively as 3G.

*CSX Corp. v. Children's Investment Fund Management*, 562 F. Supp. 2d 511, 518 (S.D.N.Y. 2008) ("*CSX I*").

-4-

133, 133-34 (2d Cir. 2008) ("*CSX II*"). In this opinion, we consider some of the issues raised by the Funds' cross-appeal and explain the reasons for our earlier order in CSX's appeal.

The parties have endeavored to frame issues that would require decision as to the circumstances under which parties to cash-settled total-return equity swap agreements must comply with the disclosure provisions of section 13(d). Such issues would turn on the circumstances under which the long party to such swap agreements may have or be deemed to have beneficial ownership of shares purchased by the short party as a hedge.

Rather than resolve such issues, as to which there is disagreement within the panel, we consider at this time only issues concerning a "group" violation of section 13(d)(3) with respect to CSX shares owned outright by the Defendants (without regard to whatever beneficial ownership, if any, they might have acquired as long parties to cash-settled total-return equity swap agreements). Because we lack sufficient findings to permit appellate review of such issues, we remand for further findings.

### Background

We describe here only the salient facts and District Court proceedings, leaving many details to the Discussion section.

TCI and 3G ("the Funds") are investment funds that in 2006 came to believe that CSX, a large railroad company, had unrealized value that a change in corporate policy and perhaps management might unlock. The Funds purchased shares in CSX and entered into cash-settled total-return equity swaps referencing CSX stock. The Funds then engaged in

a proxy fight with the management of CSX.

(a) <u>Cash-settled total-return equity swaps.</u> Total-return swaps are contracts in which parties agree to exchange sums equivalent to the income streams produced by specified assets. Total-return equity swaps involve an exchange of the income stream from: (1) a specified number of shares in a designated company's stock, and (2) a specified interest rate on a specified principal amount. The party that receives the stock-based return is styled the "long" party. The party that receives the interest-based return is styled the "short" party. These contracts do not transfer title to the underlying assets or require that either party actually own them. Rather, in a total-return equity swap, the long party periodically pays the short party a sum calculated by applying an agreed-upon interest rate to an agreed-upon notional amount of principal, as if the long party had borrowed that amount of money from the short party. Meanwhile, the short party periodically pays the long party a sum equivalent to the return to a shareholder in a specified company -- the increased value of the shares, if any, plus income from the shares -- as if the long party owned actual shares in that company.

As a result, the financial return to a long party in a total-return equity swap is roughly equivalent to the return when borrowed capital is used to purchase shares in the referenced company. Long swap positions can, therefore, be attractive to parties that seek to increase the leverage of their holdings without actually buying the shares. The short party's financial return, in turn, is equivalent to the return to someone who sold short and then lent out the proceeds

from that sale.  However, because of the inherent risks in short-equity positions -- share value can be more volatile than interest rates -- persons holding short positions in total-return equity swaps will usually choose to purchase equivalent numbers of shares to hedge their short exposure.

Total-return equity swaps may be "settled-in-kind" or "cash-settled."  When an equity swap that is settled-in-kind terminates, the long party receives the referenced security itself, in exchange for a payment equal to the security's market price at the end of the previous payment period.  When a cash-settled equity swap terminates, the short party pays the long party the sum of the referenced equity security's appreciation in market value and other net cash flows (such as dividend payments) that have occurred since the most recent periodic payment.  If this sum is negative, then the short party receives the corresponding amount from the long party.  Unlike swaps settled in kind, cash-settled swaps do not give the long party a right to acquire ownership of the referenced assets from the short party.  In all other respects, settled-in-kind and cash-settled equity swaps are economically equivalent.

(b) <u>The transactions in the present case.</u> The swaps purchased by the Funds were cash-settled total-return equity swaps referencing shares of CSX.  The Funds were the long parties, and several banks were the short parties.  Although the swap contracts did not require the short parties -- the banks -- actually to own any CSX shares, the Funds understood that the banks most likely would hedge their short swap positions by purchasing CSX shares in amounts matching the number

of shares referenced in the swaps, and the banks generally did so.[2]

The Funds' trading in CSX shares and CSX-referenced swaps followed no consistent pattern. During some periods the Funds increased their holdings; during other periods they decreased them. Almost immediately after making its initial investment in CSX, TCI approached the company to negotiate "changes in policy and, if need be, management [that] could bring better performance and thus a higher stock price," *CSX I*, 562 F. Supp. 2d at 523, which would allow TCI to profit from its swap holdings. TCI later explored the possibility of a leveraged buyout ("LBO") of CSX, and informed other hedge funds of its interest in "altering CSX's practices in a manner that TCI believed would cause its stock to rise." *Id.* at 526. When it became clear that CSX had little interest in TCI's proposed policy changes or LBO proposals, TCI began preparations for a proxy contest to effectuate its desired policy and management changes at CSX.

There is no doubt that the Funds wanted to avoid disclosure under the Williams Act until a time they believed suitable. Thus, TCI took care to disperse its swaps among multiple counterparties so that no one particular counterparty would trigger disclosure under the Williams Act by purchasing as a hedge more than 5 percent of a class of CSX securities.[3] TCI could not be certain how counterparties would

---

[2]There is evidence that at least one bank occasionally bought less than the full number of CSX shares referenced in the swaps to which it was the counterparty. *CSX I*, 562 F. Supp. 2d at 580 (App. 1, Image 9, Morgan Stanley Holdings of CSX Swaps with TCI and CSX Share Hedges, Nov. 9, 2006, to Jan. 24, 2008).

[3]3G's economic exposure to CSX stock, *i.e.*, actual shares plus CSX-referenced swaps, never exceeded 5 percent. Thus, 3G was able to use a single swap counterparty, Morgan Stanley, without concern that

-8-

vote their hedge shares but of course could vote the shares that it owned. When a proxy fight seemed likely, TCI decreased its swap holdings and purchased more CSX shares.

Meanwhile, the Funds engaged in various communications among themselves, with CSX's management, and with some of the banks. As early as November 2006, TCI had contacted CSX and two banks -- one in December 2006, and the other in January 2007 -- about the possibility of a leveraged buyout. TCI also had communications with both Austin Friars, a hedge fund owned by Deutsche Bank, and with Deutsche Bank itself about CSX. TCI and 3G communicated between themselves at various times in 2007, but not until December 19, 2007, did they file a Schedule 13D with the SEC disclosing that they had formed a "group" by "enter[ing] into an agreement to coordinate certain of their efforts with regard [*sic*] (I) the purchase and sale of [various shares and instruments] and (ii) the proposal of certain actions and/or transactions to [CSX]." *CSX I*, 562 F. Supp. 2d at 535.

On January 8, 2008, the TCI-3G group proposed a minority slate of directors for the CSX board. *See id.* at 536. The vote on this proposal occurred at the June 25, 2008, CSX shareholders' meeting.

(c) *The present action.* On March 17, 2008, CSX brought the present action against TCI and 3G in the Southern District of New York alleging, among other things, violation of the Williams Act, Pub. L. No. 90-439, 82 Stat. 454 (1968) (codified as amended at 15 U.S.C. §§ 78m(d)-(g), 78n(d),(f) (1988)), and various rules and regulations

its counterparty's hedge share purchases would trigger disclosure under the Williams Act.

promulgated thereunder.  The Williams Act added section 13(d) to the Securities Exchange Act of 1934 to require that, among other things, various disclosures be filed with the Securities and Exchange Commission ("SEC") when a "person" has acquired "beneficial ownership" of more than 5 percent of an exchange-traded class of a company's shares.  15 U.S.C. § 78m(d)(1).  Included in the statute's definition of a "person" is a "group [acting] for the purpose of acquiring, holding, or disposing of securities of an issuer."  15 U.S.C. § 78m(d)(3).

The District Court held that, for purposes of section 13(d), TCI was deemed a beneficial owner of all CSX shares held by banks as hedges against TCI's CSX-referenced swaps, and thus that TCI violated section 13(d) by failing to make timely filings once TCI's combined holdings of CSX shares and CSX-referenced swaps crossed the 5 percent ownership threshold. *See CSX Corp. I*, 562 F. Supp. 2d at 552.  In making this ruling, the District Court considered whether TCI had beneficial ownership of the hedged shares pursuant to both SEC Rule 13d-3(a), which defines a beneficial owner, [4] and SEC Rule 13d-3(b), which identifies circumstances under which a person shall be deemed to

---

[4]Rule 13d-3(a) provides:

> For purposes of sections 13(d) and 13(g) of the Act a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:
>> (1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or
>> (2) Investment power which includes the power to dispose, or to direct the disposition of, such security.

17 C.F.R. § 240.13d-3(a).

be a beneficial owner.[5] *See* 17 C.F.R. § 240.13d-3(a), (b). Ultimately, the District Court did not rule on whether TCI was a beneficial owner under Rule 13d-3(a), *see CSX I*, 562 F. Supp. 2d at 548, but did rule that TCI was deemed a beneficial owner under Rule 13d-3(b) because it had "created and used the [swaps] with the purpose and effect of preventing the vesting of beneficial ownership in TCI as part of a scheme or plan to evade the reporting requirements of Section 13(d)," *id.* at 552.

The District Court also found that TCI and 3G violated section 13(d) by failing to make timely disclosure of having formed a "group" "with respect to CSX securities . . . no later than February 13, 2007." *Id.* at 555.

The Court granted CSX a permanent injunction against TCI and 3G, prohibiting any further violations of section 13(d), whether or not involving CSX shares. *Id.* at 573-74. The Court concluded that it was foreclosed as a matter of law from granting an injunction prohibiting the Funds from voting the 6.4 percent of CSX shares that they had acquired after forming a group. *Id.* at 568-72. CSX appealed this denial of an injunction against voting the disputed shares. The Funds

_____

[5]Rule 13d-3(b) provides:

> Any person who, directly or indirectly, creates or uses a trust, proxy, power of attorney, pooling arrangement or any other contract, arrangement, or device with the purpose of [sic] effect of divesting such person of beneficial ownership of a security or preventing the vesting of such beneficial ownership as part of a plan or scheme to evade the reporting requirements of section 13(d) or (g) of the Act shall be deemed for purposes of such sections to be the beneficial owner of such security.

17 C.F.R. 240.13d-3(b).

cross-appealed the District Court's finding that the Funds had violated section 13(d) and the grant of a permanent injunction against any future violations of section 13(d).  On September 15, 2008, we entered an order affirming on CSX's appeal, but deferred until now our discussion of the reasons for that order. *See CSX II*, 292 F. App'x at 133–34.

## Discussion

We leave discussion of the merits of the now-resolved CSX appeal, i.e., the issue of whether prohibiting the Funds from voting the CSX shares was an appropriate remedy for the alleged violation, to the end of this opinion, and turn to the Funds' cross-appeal.  As to that appeal, the panel is divided on numerous issues concerning whether and under what circumstances the long party to a credit-default swap may be deemed, for purposes of section 13(d), the beneficial owner of shares purchased by the short party as a hedge.  In view of that disagreement, we conclude that it is appropriate at this time to limit our consideration to the issue of group formation, *see* 15 U.S.C. § 78m(d)(3), an issue as to which we seek further findings from the District Court.  All members of the panel are in agreement as to this disposition.

## I. Statutory and Regulatory Framework

Section 13(d) provides in pertinent part:

> (1) Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 78l of this title . . . , is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, [disclose to the issuer, the SEC, and the

exchanges] a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations, prescribe as necessary or appropriate in the public interest or for the protection of investors . . . .

. . .

(3) When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a "person" for the purposes of this subsection.

15 U.S.C. § 78m(d)(1), (3).[6]

SEC Rule 13d–5(b)(1) provides that the section 13(d) disclosure requirements apply to the aggregate holdings of any "group" formed

---

[6]Section 13(d) was part of the 1968 Williams Act's response to the (then) growing use of tender offers to effectuate corporate takeovers, a trend that had "removed a substantial number of corporate control contests from the reach of existing disclosure requirements of the federal securities laws." *Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1, 22 (1977). In explaining its purpose in enacting section 13(d), Congress used the language of investor protection. *See* H.R. Rep. No. 90–1711, at 2–3 (1968) ("The public shareholder must, therefore, with severely limited information, decide what course of action he should take. . . . [N]o matter what he does, he does it without adequate information to enable him to decide rationally what is the best possible course of action. This is precisely the kind of dilemma which our Federal securities laws are designed to prevent."); *see also Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 58 (1975) ("The purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the offering party"). Of course, one effect of the Williams Act's provisions is to alert not only a firm's shareholders but also the firm's incumbent management to potential competitors for control of that firm. *See* James D. Cox, Robert W. Hillman & Donald C. Langevoort, *Securities Regulation: Cases and Materials* 969 (5th ed. 2006) ("The ostensible statutory purpose is to notify shareholders of the target company of a potential shift in control. . . . But one other beneficiary of the disclosure is quite clear. If it is not already aware of the bidder's activity, target management will take the early warning and begin defensive efforts in earnest.") (citation omitted).

"for the purpose of acquiring, holding, voting or disposing" of equity securities of an issuer. 17 C.F.R. § 240.13d-5(b)(1). This Rule tracks section 13(d)(3) in all respects except that the Rule adds voting as a group for the purpose of triggering the disclosure provisions. *Compare id. with* 15 U.S.C. § 78m(d)(3). "'[T]he touchstone of a group within the meaning of section 13(d) is that the members combined in furtherance of a common objective.'" *Roth v. Jennings*, 489 F.3d 499, 508 (2d Cir. 2007) (quoting *Wellman v. Dickinson*, 682 F.2d 355, 363 (2d Cir. 1982)).

II. "Group" Violation

There are three kinds of groups that might be found in the present matter. One might consist of one or more long parties (the Funds) and one or more short counterparties that have hedged with shares (the banks). The second might consist of the Funds, *i.e.*, TCI and 3G. The third might consist of banks that have purchased shares as a hedge. Only the possibility of a group comprising TCI and 3G is at issue on this appeal.

As we have noted, the statute and the implementing rule are both concerned with groups formed for the purpose of acquiring shares of an issuer. *See* 15 U.S.C. § 78m(d)(3); 17 C.F.R. § 240.13d-5(b)(1). The District Court recognized that whether a group exists under section 13(d)(3) "turns on 'whether there is sufficient direct or circumstantial evidence to support the inference of a formal or informal understanding between [members] *for the purpose of acquiring, holding, or disposing of securities*.'" *CSX I*, 562 F. Supp. 2d at 552 (quoting *Hallwood Realty Partners, L.P. v. Gotham Partners, L.P.*, 286

-14-

F.3d 613, 617 (2d Cir. 2002) (emphasis added).

Endeavoring to meet the statutory standard, the District Court found that TCI and 3G formed a group, within the meaning of section 13(d)(3), "with respect to CSX securities," and that this group was formed no later than February 13, 2007. *See id.* at 555. Then, after identifying the Defendants' "activities and motives throughout the relevant period," *id.* at 553, the Court stated, "These circumstances . . . all suggest that the parties' *activities* from at least as early as February 13, 2007, were products of concerted action . . . ." *Id.* at 554 (emphasis added).

These findings are insufficient for proper appellate review. Although the District Court found the existence of a group "with respect to CSX securities," the Court did not explicitly find a group formed for the purpose of acquiring CSX securities. Even if many of the parties' "activities" were the result of group action, two or more entities do not become a group within the meaning of section 13(d)(3) unless they "act as a . . . group for the purpose of acquiring . . . securities of an issuer." 15 U.S.C. § 78m(d)(3).

Moreover, because the District Court deemed the Funds, as long parties to cash-settled total-return equity swap agreements, to have a beneficial interest in shares acquired by hedging short parties to such agreements, the Court did not distinguish in its group finding between CSX shares deemed to be beneficially owned by the Funds and those owned outright by the Funds. However, with our current consideration of a group violation confined to CSX shares owned outright by the Funds, a precise finding, adequately supported by

-15-

specific evidence, of whether a group existed for purposes of acquiring CSX shares outright during the relevant period needs to be made in order to facilitate appellate review, and we will remand for that purpose. Because the combined total outright ownership of CSX shares by TCI and 3G crossed the 5 percent threshold by April 10, 2007, a TCI/3G group, if it was formed for the statutorily defined purpose, would have been required to file a section 13(d) disclosure within ten days, *i.e.*, by April 20, 2007, *see* 15 U.S.C. § 78m(d); 17 C.F.R. § 240.13d-1. Thus, on remand the District Court will have to make findings as to whether the Defendants formed a group for the purpose of "acquiring, holding, voting or disposing," 17 C.F.R. § 240.13d-5(b)(1), of CSX shares owned outright, and, if so, a date by which at the latest such a group was formed. Only if such a group's outright ownership of CSX shares exceeded the 5 percent threshold prior to the filing of a section 13(d) disclosure can a group violation of section 13(d) be found.

III. Appropriateness of Injunctive Relief

Because on remand, the District Court might find a section 13(d) group violation with respect to a group acquisition of CSX shares outright and the Defendants, on the cross-appeal, have disputed the propriety of an injunction, even on the basis of the violations as found by the District Court, we will briefly consider some of the considerations relevant to injunctive relief.

It is settled in this Circuit that an issuer has an implied right of action to seek injunctive relief for a violation of section 13(d), *see GAF Corp. v. Milstein*, 453 F.2d 709, 720 (2d Cir. 1971), but must

-16-

satisfy traditional equitable requirements for an injunction, *see Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 57 (1975). We have recognized that a prohibition on future securities law violations has "grave consequences" because it subjects a defendant to contempt sanctions and also has "serious collateral consequences." *S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1040 (2d Cir. 1990). The usual basis for prospective injunctive relief is not only irreparable harm, which is required for all injunctions, *see Rondeau*, 422 U.S. at 57 (citing *Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 506–07 (1959)), but also "'some cognizable danger of recurrent violations,'" *Rondeau*, 422 U.S. at 59 (quoting *United States v. W.T. Grant Co.*, 345 U.S. 629, 633 (1953)).

In this case, the District Court considered both irreparable harm and the probability of future violations. See *CSX I*, 562 F. Supp. 2d at 572–73. Having held that the Funds violated section 13(d), the District Court issued a broad permanent injunction against future violations, an injunction not limited to CSX shares:

> Defendants, their officers, agents, servants, employees, attorneys, and all persons in active concert or participation with any of the foregoing who receive actual notice of this injunction . . . are enjoined and restrained from violating Section 13(d) of the Securities Exchange Act of 1934, 15 U.S.C. §78m(d), and Regulation 13D thereunder . . . .

The District Court predicated this broad injunction on the basis of a section 13(d) violation that took into account not only the shares of CSX that the Funds owned outright but also the much larger quantity of shares purchased as hedges by the short parties to CSX-referenced swaps. Because this opinion considers only the more

–17–

limited issue of whether the Funds, as a group, committed a violation of section 13(d) with respect to shares that they owned outright, if the District Court on remand finds the existence of a group formed to acquire CSX shares outright during the relevant period, it will have to reconsider the appropriateness of an injunction, and, if one is to be issued, what should be its appropriate scope.

If a section 13(d) violation is found, limited to a group violation with respect to purchase of the shares outright (which is the only violation considered in this opinion), the threat of future violations would be less substantial than appeared to the District Court, which based its broad injunction (*i.e.*, not limited to CSX shares) on its view that the Funds were deemed to be beneficial owners of the hedged shares purchased by the short parties to the swap agreements.

Another factor that would arguably weigh against a broad injunction is the disclosure that CSX made just prior to the expiration of the ten-day period following April 10, 2007, the date when the group's total of CSX shares owned outright crossed the 5 percent threshold. On April 18, 2007, CSX filed its Form 10-Q for the period ending March 30, 2007. The Form 10-Q reported that TCI had made a filing under the Hart-Scott-Rodino Antitrust Improvements Act, Pub. L. No. 94-435, 90 Stat. 1383 (1976), of its intention to acquire more than $500 million of CSX stock and that TCI "currently holds a significant economic position through common stock ownership and derivative contracts tied to the value of CSX stock." *CSX I*, 562 F. Supp. 2d at 527 (internal quotation marks omitted). Thus, TCI's

control ambitions were known to the public before it was required to file under section 13(d), at least with respect to the group's outright ownership of shares as of April 10, 2007. We recognize that a Hart-Scott-Rodino filing does not reveal all of the information required by a section 13(d) disclosure. Nevertheless, the filing has a bearing on the scope of relief warranted for the limited section 13(d) violation we have considered in this opinion.

On the other hand, if a section 13(d) violation, even a limited one, is found on the basis of a group purchase of shares outright and non-disclosure when the group's holdings crossed the 5 percent threshold, it would continue to be relevant that the District Court has found that some of the parties "testified falsely in a number of respects, notably including incredible claims of failed recollection." *CSX I,* 562 F. Supp. 2d at 573. The District Court was within its discretion in concluding that people who have lied about securities matters can reasonably be expected to attempt securities laws violations in the future.

Under all the circumstances, we will remand to the District Court so that it may (a) determine whether the evidence permits findings as to the formation of a group, as described above, a date by which at the latest such a group was formed, and whether such a group's outright ownership of CSX shares crossed the 5 percent threshold prior to the filing of a section 13(d) disclosure, and (b) if a group violation of section 13(d) is found, reconsider the appropriateness and scope of injunctive relief based only on the group's failure to disclose outright ownership of more than 5 percent of CSX's shares.

IV. Injunctive "Sterilization" of the Disputed Shares

The District Court concluded that it was foreclosed as a matter of law from enjoining the Funds' voting of CSX shares acquired between the latest date on which their section 13(d) disclosure obligations might have begun and the date on which they actually made those disclosures. *See CSX I*, 562 F. Supp. 2d at 568–72. CSX argues that the Court should have enjoined the voting of those shares on three grounds: (I) courts generally have broad powers to grant injunctive relief; (ii) a "sterilization" injunction was necessary to promote the ends of the Williams Act both by leveling the playing field in the contest for corporate control in order to partially restore the integrity of the shareholder franchise and by deterring future violations of the Act's disclosure provisions; and (iii) courts have "inherent authority" to sanction litigation misconduct.

In *Treadway Companies, Inc. v. Care Corp.*, 638 F.2d 357 (2d Cir. 1980), we held that "an injunction will issue for a violation of § 13(d) only on a showing of irreparable harm to the interests which that section seeks to protect." 638 F.2d at 380. We also said that "[t]he goal of § 13(d) is to alert the marketplace to every large, rapid aggregation or accumulation of securities . . . which might represent a potential shift in corporate control." <u>Id.</u> (internal quotation marks omitted) (second alteration in original); *see also Rondeau*, 422 U.S. at 58 ("The purpose of the Williams Act is to insure that public shareholders who are confronted by a cash tender offer for their stock will not be required to respond without adequate information regarding the qualifications and intentions of the

offering party."). Thus, the interests that section 13(d) protects "are fully satisfied when the shareholders receive the information required to be filed." *Treadway*, 638 F.2d at 380; *see also United States v. O'Hagan*, 521 U.S. 642, 668 (1997) ("Congress designed the Williams Act to make disclosure, rather than court-imposed principles of 'fairness' or 'artificiality,' . . . the preferred method of market regulation.") (internal quotation marks and citation omitted) (alteration in original). Consequently, in *Treadway*, we held that because shareholders had received the required information four months before the proxy contest in that case, "there was no risk of irreparable injury and no basis for injunctive relief." 638 F.2d at 380. In the present matter, the Funds' section 13(d) disclosures occurred in December 2007, approximately six months before the June 25, 2008, shareholders' meeting. Therefore, following *Treadway*, we conclude that injunctive share "sterilization" was not available.

CSX, however, argues that the Williams Act does not aim merely at timely dissemination of information but more broadly "seeks to provide a level playing field and to promote compliance." Appellant's Brief at 48. For this proposition, CSX relies on a passing remark, in a footnote, in which the Supreme Court expressed skepticism about "whether 'deterrence' of § 14(e) violations is a meaningful goal, except possibly with respect to the most flagrant sort of violations which no reasonable person could consider lawful." *Piper v. Chris-Craft Indus., Inc.*, 430 U.S. 1, 40 n.26 (1977). Far from supporting CSX's claim, this remark mentions none of the goals of the Williams Act, concerns section 14(e) rather than section 13(d), and actually

-21-

casts doubt upon the usefulness of determining remedies with an eye toward promoting compliance.

CSX also rests its "level playing field" claim on two Supreme Court cases that include "fair corporate suffrage" as among the original goals of the Securities Exchange Act of 1934: *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1103 (1991), and *J.I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964). However, neither case attributed that goal to the Williams Act, and there is no reason to conclude that adequate timely disclosure of the information covered by the Williams Act would be insufficient to ensure the "fairness" of a subsequent shareholder vote.

CSX also argues that the importance of deterring violations of section 13(d) provides a general policy-based reason for prohibiting the Funds from voting the disputed shares. Refusing to "sterilize" the voted shares would, CSX argues, leave the Williams Act toothless. However, a statutory provision is not necessarily rendered toothless for lack of a particular sanction. We also note that the proposed sanction might have injured those shareholders who, fully informed, chose to vote with the insurgents.

The inappropriateness of share sterilization in such circumstances leaves open the question of what remedies might be appropriate when disclosure that is timely with respect to a proxy contest is not made, and we do not reach that issue here.

CSX quotes *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60 (1992), to the effect that once a federal right of action exists there is a "traditional presumption" that courts can use "all

available remedies" unless Congress clearly has provided otherwise. 503 U.S. at 72. In a similar vein, CSX argues that because the District Court found that officials of both Funds testified falsely, *see CSX I,* 562 F. Supp. 2d at 573, the Court was permitted to issue an injunction to "sterilize" the Funds' disputed shares as a way of sanctioning abuses of the judicial process. However, neither the presumption about the general availability of remedies nor the responsibility of federal courts to protect the integrity of their proceedings, *see*, *e.g.*, *In re Martin-Trigona*, 737 F.2d 1254, 1261 (2d Cir. 1984), supersedes *Treadway*'s holding: in the case of section 13(d), an injunction prohibiting the voting of shares is inappropriate when the required disclosures were made in sufficient time for shareholders to cast informed votes. *See Treadway*, 638 F.2d at 380. Whether timely or not, the stated purpose of disclosure -- allowing informed action by shareholders, *see supra* note 5-- was fulfilled.

Conclusion

The District Court's denial of an injunction against the voting of shares is again affirmed, the injunction issued to prohibit future violations of 13(d) is vacated, and the case is remanded to the District Court for further proceedings consistent with this opinion. In the event of a subsequent appeal, any party may restore jurisdiction to this Court by notice to the Clerk within 30 days of any order or judgment sought to be appealed, without a new notice of appeal, in which event such appeal will be referred to this panel. *See United States v. Jacobson*, 15 F.3d 19, 21–22 (2d Cir. 1994).

WINTER, <u>Circuit Judge</u>, concurring:

I concur in the judgment remanding for further findings.

The district court's finding of a February 2007 group formation that required disclosure under Rule 13d-5(b)(1) cannot be upheld for various reasons discussed <u>infra</u>. Particularly, it was based in part on a flawed analysis of the economic and legal role of cash-settled total-return equity swap agreements.

The court viewed the economic role of such swaps as an underhanded means of acquiring or facilitating access to CSX stock that could be used to gain control through a proxy fight or otherwise. In my view, without an agreement between the long and short parties permitting the long party ultimately to acquire the hedge stock or to control the short party's voting of it, such swaps are not a means of indirectly facilitating a control transaction. Rather, they allow parties such as the Funds to profit from efforts to cause firms to institute new business policies increasing the value of a firm. If management changes the policies and the firm's value increases, the Funds' swap agreements will earn them a profit for their efforts. If management does not alter the policies, however, and a proxy fight or other control transaction becomes necessary, the swaps are of little value to parties such as the Funds. Absent an agreement such as that described above, such parties must then,

1

as happened here, unwind the swaps and buy stock at the open market price, thus paying the costs of both the swaps and the stock.

The district court's legal analysis concluded that the one role of such swaps was to avoid the disclosure requirements of Section 13(d) -- no doubt true -- and therefore violated Rule 13d-3. The legal conclusion, however, was also flawed, leaving unmentioned, <u>inter</u> <u>alia</u>, explicit legislation regarding swaps and Supreme Court decisions discussing statutory triggers involving "beneficial ownership" of a firm's stock. That legislation and those decisions, as they stood at the time, foreclosed the conclusion reached by the district court. Finally, the recent Dodd-Frank bill and SEC response thereto make it clear that the district court's analysis is not consistent with present law. Dodd-Frank Wall Street Reform Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010); Beneficial Ownership Reporting Requirements and Security Based Swaps, S.E.C. Release No. 64,087, 17 C.F.R. Part 240, 2011 WL 933460, at *2 (June 8, 2011).

I

In my view, cash-settled total-return equity swaps do not, without more, render the long party a "beneficial owner" of such shares with a potential disclosure obligation under Section 13(d). However, an agreement or understanding between the long and short parties to such a swap regarding the short party's

2

purchasing of such shares as a hedge, the short party's selling of those shares to the long party upon the unwinding of the swap agreements, or the voting of such shares by the short parties renders the long party a "beneficial owner" of shares purchased as a hedge by the short party.

My discussion of the basis of this conclusion will begin with an examination of aspects of the underlying statutory scheme and resultant caselaw not discussed by the district court. It will then turn to the application of relevant rules promulgated by the SEC.

a) The Statutory Scheme

Examination of the statutory scheme is particularly important in this matter, for two reasons. First, critical language used in Section 13(d) is used elsewhere in the 1934 Act, and some harmonization of interpretation is desirable, if not necessary. Second, in 2000 and 2010, Congress amended the 1934 Act with particular reference to security-based swaps in ways relevant to this case.

To reiterate, Section 13(d) requires disclosure of a variety of information[1] by single beneficial owners of more than 5

---

[1] Information that must be disclosed under Section 13(d) includes: (1) the background, identity, residence and citizenship of the purchaser; (2) the name of the issuer, class of securities and aggregate amount purchased or to be purchased; (3) the source and amount of funds or other consideration used or to be used in making the purchase; and (4) the purpose of the acquisition. See 15 U.S.C. § 78m(d)(1); 17 C.F.R. § 240.13d-101.

3

percent of a firm's equity securities.  It also requires similar disclosure by a group of beneficial owners, who own in the aggregate more than 5 percent of a firm's shares, when a purpose of the group is to acquire, hold, or dispose of such securities. See 15 U.S.C. § 78m(d).

Some measure of certainty should be accorded to persons subject to Section 13(d)'s disclosure requirements.  Investors benefit little from case by case, prolonged, expensive and repetitive litigation that weighs amorphous standards and circumstantial evidence regarding state of mind with disparate outcomes, particularly when the underlying information quickly loses its relevance because of ever-changing commercial environments.  Even where a disclosure requirement seems less than fully comprehensive, knowledge of what need be disclosed and what need not at least leaves the market with some certainty as to the unknown.

In the present case, much certainty can be provided simply by following the language of Section 13(d).  The language does not impose a general disclosure requirement that is triggered by an intent to obtain control or an equity position of influence within a particular company.  Nor does it purport to require, as suggested by the district court, disclosure of all steps that

4

might be part of a control transaction in the eyes of a court.[2] Rather, it specifies precise _conduct_ constituting the disclosure trigger:  the acquisition, alone or in coordination with others, of "beneficial ownership" of 5 percent of any "equity security" of a company.  15 U.S.C. § 78m(d)(1).

The term "beneficial owner[s] . . . of any equity security" was not drawn from thin air in 1968.  Id.  It was already a familiar term from its use in Section 16, which was part of the original 1934 Act.  Section 16 requires the reporting of purchases and sales, and disgorgement of profits from certain of those sales, by a defined group of insiders:  directors, officers, and, importantly for my purposes, "beneficial owner[s] of more than 10 percent of . . . any equity security" of a firm. 15 U.S.C. § 78p(a)(1).  In brief, such beneficial owners (and directors or officers) must register, disclose their purchases and sales, and disgorge to the firm profits they made in short-swing trades -- _i.e._, from purchases and sales of the firm's shares within six months of each other.  15 U.S.C. §§ 78p(a), (b).

The purpose of Section 16 is generally said to be to reveal transactions by insiders, so defined, and to prevent short-swing

---

[2] See, e.g., CSX Corp. v. Children's Inv. Fund Mgmt. (UK) LLP, 562 F. Supp. 2d. 511, 540 (S.D.N.Y. 2008) (suggesting that in establishing its regulations under Section 13(d), the SEC sought "to cast a very broad net to capture all situations in which the marketplace should be alerted to circumstances that might result in a change in corporate control").

profit making based on non-public, material information, <u>i.e.</u>, insider trading. <u>See, e.g.</u>, <u>Foremost-McKesson, Inc. v. Provident Sec. Co.</u>, 423 U.S. 232, 243 (1976) (describing the purpose of Section 16(b)); H.R. Rep. 73-1383, at 13, 24 (1934) (stating that Section 16(a) was motivated by a belief that "the most potent weapon against the abuse of inside information is full and prompt publicity" and by a desire "to give investors an idea of the purchases and sales by insiders which may in turn indicate their private opinion as to prospects of the company").

Section 16 relies as fundamentally on the concept of beneficial ownership as does Section 13(d). Subsequent to court decisions that both rejected the SEC's views and read Section 16 in a mechanical way, <u>see</u> <u>Reliance Elec. Co. v. Emerson Elec. Co.</u>, 404 U.S. 418 (1972), the SEC, in promulgating Rules 13d-3(a) and (b) stated that Section 13(d) and Section 16 had different purposes and the new rules were "not intended to affect interpretations of Section 16." Adoption of Beneficial Ownership Disclosure Requirements, Securities Act Release No. 5808, Exchange Act Release No. 13,291, 42 Fed. Reg. 12,342, 12,342-43 (Mar. 3, 1977).

However, in 1991, the SEC harmonized Section 16's interpretation of beneficial ownership of 10 percent with the corresponding provisions (but for a 5 percent requirement) of Section 13(d). <u>See</u> Ownership Reports and Trading by Officers,

6

Directors and Principal Security Holders, Exchange Act Release No. 28,869, Investment Company Act Release No. 17,991, 56 Fed. Reg. 7242, 7244-45 (Feb. 21, 1991). By SEC rule, a "beneficial owner" under Section 16 was defined as "any person who is deemed a beneficial owner pursuant to section 13(d) of the [1934] Act."[3] 17 C.F.R. § 240.16a-1(a)(1). One effect of this rule was to apply Rules 13d-3(a) and (b) in interpreting Section 16, perhaps a less consequential step than it seems in the context of the present issues because no great conflicts of interpretation had arisen. A perhaps more significant step was to apply Rule 13d-5(b)(1), which defines a group, discussed infra, to Section 16 determinations of whether multiple holders of equity securities are in the aggregate a "beneficial owner" of 10 percent. Thus, SEC rules interpret the term "beneficial ownership" to be the same under Section 13(d) as under Section 16.

Even without Rule 16a-1(a)(1), the pertinent language of the two sections is identical, and harmonization of interpretation is normally necessary. See, e.g., Gustafson v. Alloyd Co., Inc., 513 U.S. 561, 570 (1995) ("The 1933 [Securities] Act, like every Act of Congress, should not be read as a series of unrelated and

---

[3] I note that this Rule states only that Section 13(d) standards govern the definition of beneficial owner under Section 16. However, this does not mean that Section 16 does not inform the interpretation of "beneficial owner" under Section 13(d). That term was used first in Section 16 in 1934, and when Congress adopted it for use in Section 13(d) in 1968, there was no indication that a different meaning was intended or that the canon of statutory construction requiring harmonization was not to apply.

7

isolated provisions. Only last Term we adhered to the 'normal rule of statutory construction' that 'identical words used in different parts of the same act are intended to have the same meaning.'") (quoting Dep't of Revenue of Or. v. ACF Indus., Inc., 510 U.S. 332, 342 (1994)); 2A Norman J. Singer & J.D. Shambie Singer, Sutherland Statutes and Statutory Construction § 46:6 (7th ed. 2008). The provisions of Section 16 relating to beneficial ownership, and the caselaw under it, thus inform and cabin any interpretation of the meaning of beneficial ownership under Section 13(d).

The caselaw under Section 16 is particularly informative with regard to whether Section 13(d) is to be interpreted as giving decisive weight to a would-be acquirer's intentions toward a target, as the district court did, or whether a more mechanical, conduct-based interpretation is appropriate. Although modern financial transactions have generated some close cases -- e.g., Kern County Land Co. v. Occidental Petroleum Co., 411 U.S. 582 (1973) -- the application of Section 16 is largely mechanical, that is, independent of the purposes or state of mind of parties to a transaction. See, e.g., Magma Power Co. v. Dow Chem. Co., 136 F.3d 316, 320-21 (2d Cir. 1998) ("Section 16(b) operates mechanically, and makes no moral distinctions, penalizing technical violators of pure heart, and bypassing corrupt insiders who skirt the letter of the prohibition. Such

8

is the price of easy administration.") (internal quotation marks omitted). For example, disgorgement has not been required for a stock purchase and sale made by a board member on the same day the member resigned, when the resignation became effective before the execution of the transactions. Lewis v. Bradley, 599 F. Supp. 327, 330 (S.D.N.Y. 1984) ("Bradley's resignation was the first order of business; next, was the sale and delivery of the shares; and finally, the exercise of his option rights. That the sequence of events may have been deliberately designed is of no consequence."); see also B.T. Babbitt, Inc. v. Lachner, 332 F.2d 255, 258 (2d Cir. 1964) ("Since the interval between the purchase and the sale exceeded six months -- if only by one day -- any profit which Lachner may have made on the transaction is not recoverable under § 16(b).").

For another and very pertinent example, Section 16 has been held to allow a 13.2 percent shareholder to avoid disgorgement of profits made on a sale of 9.96 percent of the shares made within six months of their purchase by strategic timing of the sales. Reliance Elec., 404 U.S. at 419-20. The shareholder first sold enough shares to reduce its holdings to 9.96 percent, just below the 10 percent threshold, and then sold the rest of its shares shortly thereafter. Id. at 420. The shareholder avoided disgorgement of the profits on the second sale even though the two sales "were effected pursuant to a single predetermined plan

9

of disposition with the overall intent and purpose of avoiding Section 16(b) liability."[4]  Id. at 421 (internal quotation marks omitted).

In so holding the Supreme Court stated:

> The history and purpose of § 16(b) have been exhaustively reviewed by federal courts on several occasions since its enactment in 1934.  Those courts have recognized that the only method Congress deemed effective to curb the evils of insider trading was a flat rule taking the profits out of a class of transactions in which the possibility of abuse was believed to be intolerably great.  As one court observed:
>
> In order to achieve its goals, Congress chose a relatively arbitrary rule capable of easy administration.  The objective standard of Section 16(b) imposes strict liability upon substantially all transactions occurring within the statutory time period, regardless of the intent of the insider or the existence of actual speculation.  This approach maximized the ability of the rule to eradicate speculative abuses by reducing difficulties in proof.  Such arbitrary and sweeping coverage was deemed necessary to insure the optimum prophylactic effect.
>
> Thus Congress did not reach every transaction in which an investor actually relies on inside information.  A person avoids liability if he does not meet the statutory definition of an "insider," or if he sells more than six months after purchase.  Liability cannot be imposed simply because

_____

[4] The Supreme Court noted that the SEC had filed a brief as amicus curiae arguing that the proper interpretation of the 1934 Act would require disgorgement of the profits.  Reliance Elec., 404 U.S. at 425-26.  The Court explicitly rejected the SEC's proposed construction of the 1934 Act.  Id. at 426-27.

10

> the investor structured his transaction with the intent of avoiding liability under § 16(b). The question is, rather, whether the method used to "avoid" liability is one permitted by the statute.

Id. at 422 (internal quotation marks and citations omitted). Given the Supreme Court's direction to harmonize the interpretation of multiple statutory uses of identical language and SEC Rule 16a-1, the well-established approach of Section 16 governs the interpretation of "beneficial ownership of any equity security" in Section 13(d). 15 U.S.C. § 78m(d)(1).

A large measure of certainty is provided by this test's mechanical attributes, but, as Reliance Electric noted with regard to Section 16, at a cost. 404 U.S. at 422. Application of the language of Section 13(d) leads to an inevitable overbreadth -- requiring disclosure where no control or influence is intended by a holder of 5 percent of shares.

There is also an inevitable underbreadth, see id. -- not requiring disclosure of conduct that constitutes significant steps in an attempt to gain control but does not fall within the pertinent language. Without triggering any disclosure requirement, a potential acquirer can, for example, amass 4.9 percent of the target company's shares. The potential acquirer may further make inquiry of some large shareholders with an eye to learning how many shares might be available for private purchases in the future and what price ranges are likely, so long

11

as there is no implicit or explicit agreement to buy.  <u>Pantry Pride, Inc. v. Rooney</u>, 598 F.Supp 891, 900 (S.D.N.Y. 1984) ("Section 13(d) allows individuals broad freedom to discuss the possibilities of future agreements without filing under securities laws.").  Such inquiries may cause -- and be expected to cause -- these other shareholders to keep or acquire more shares than they otherwise would, in anticipation of the potential acquirer deciding to make an acquisition.

The same potential acquirer may line up financing in anticipation of a large purchase of the target company's shares in a short period of time.  The potential acquirer can then form a group with other like-minded investors and coordinate future plans to buy the target company's stock, again so long as the 5 percent ownership threshold is not yet reached.  The group may then cross the threshold and acquire an unlimited amount of the company's securities over a ten-day period before being required to make disclosure.[5]  So long as "the method used to

---

[5] Critics who believe the Williams Act's provisions are too lenient have, as a result, unsuccessfully sought to shorten the time before disclosure is required.  One of the most visible efforts was the Tender Offer Disclosure and Fairness Act of 1987, which would have reduced the Section 13(d) reporting deadline from ten days to five days.  <u>See</u> Report of the Senate Committee on Banking, Housing and Urban Affairs on the Tender Offer Disclosure and Fairness Act of 1987, S. Rep. No. 100-265, at 19 (1987).  Senator William Proxmire, the bill's sponsor, described the motivation behind that proposal:

> During the ensuing 10 days, the company's shareholders are kept in the dark.  The general investor knows nothing about this acquisition.  Meanwhile, in that 10-day period, the acquirer knows, the arbitragers know, the people who are working with him know about the deal.  They are the insiders.  They can move

12

'avoid' [disclosure] is one permitted by the statute," <u>Reliance</u>

<u>Elec.</u>, 404 U.S. at 422, it does not matter that a firm or group

of firms employing that method consciously sought to avoid

disclosure under Section 13(d).  That result flows from the

statutory language and is not for courts to alter.  However,

perhaps because of the way this case was argued, none of the

pertinent authority established under Section 16 was discussed by

> swiftly; they can move invisibly.  They may acquire
> working control of the corporation without the
> knowledge of the overwhelming majority of shareholders
> or the management.  Icahn grabbed 20 percent of TWA
> before the 10-day window closed.

134 Cong. Rec. S8224-01 (June 20, 1988) (statement of Sen. Proxmire)
(paragraph break omitted).

Senator Paul Sarbanes, a co-sponsor of Proxmire's bill, echoed this
concern:

> Under current law, any person who acquires more
> than 5 percent of a company's stock need not file a
> disclosure statement of having done that until 10 days
> after the acquisition that exceeds the 5-percent
> threshold.  This has permitted stock acquisitions much
> greater than 5 percent during the 10-day window period
> before any disclosure is required. . . . As a result,
> by the time the first disclosure is made, a person may
> have accumulated a very significant interest in excess
> of 5 percent in the company.

> In fact, in some instances, they may even have
> secured a controlling interest in the company,
> particularly if you define "controlling" as being a
> much smaller figure than a majority interest, since a
> person holding a very large interest, with everyone
> else holding a very small interest, is perceived as
> controlling, even though they are short of majority
> control.

<u>Id.</u> (statement of Sen. Sarbanes).

Senator Paul Simon unsuccessfully introduced a bill that would have been
even more restrictive than Proxmire's, proposing that disclosure be required
after only two days, and lowering the ownership threshold from 5 percent to 2
percent.  <u>See</u> Richard Greenfield, <u>Merger Mania:  Don't Blame "Raiders" for
Systemwide Abuses</u>, Legal Times, Apr. 4, 1988, at 16.

13

the district court, which gave overwhelming weight to the Funds'
intent.

The district court also did not consider the fact that
Congress has been well aware of legal issues involving swaps for
years and has repeatedly passed legislation regarding them, all
of which is specifically relevant to the issues in this case and
generally relevant to the propriety of, or need for, courts'
adopting legal rules that Congress and the SEC have avoided.  For
example, as part of the 2000 amendments discussed infra, Congress
exempted security-based swap agreements from the 1934 Act's
definition of a security.  See infra note 6; Commodity Futures
Modernization Act of 2000, Pub. L. No. 106-554, app. E, sec. 301
& 303, § 206B (amendment to the Gramm-Leach-Bliley Act, Pub. L.
No. 106-102 (1999)), & § 3A (amendment to the 1934 Act), 114
Stat. 2763, 2763A-449 to -453 (codified at 15 U.S.C. §§ 78c-1,
78c note).  In 2010, as part of the Dodd-Frank bill, Congress
included security-based swaps in the 1934 Act's definition of a
security.  Dodd-Frank Wall Street Reform Protection Act §
761(a)(2).

However, neither exemption from, nor inclusion in, the
definition of security affects the outcome here because Section
13(d) applies to securities issued by a target firm and the swap
instruments in question were not issued by CSX.  Nor do the
legislative definitions explicitly resolve the issue of whether

14

the long party to a cash-settled total-return equity-based swap agreement is the "beneficial owner" of referenced securities purchased as a hedge by the short party.  I turn to that issue <u>infra</u>.

My point, nevertheless, is that Congress was well aware of the issues arising from security-based swaps.  In fact, security-based swap agreements are a metaphoric Alsace-Lorraine in the conflicting claims of jurisdiction by the SEC and the Commodity Futures Trading Commission ("CFTC") over securities futures products.  <u>See</u> Peter J. Romeo & Alan L. Dye, <u>Section 16 Treatise and Reporting Guide</u> § 1.02[5], at 48-49 (Michael Gettelman ed., 3d ed. 2008).

The 2000 legislation, in effect at the time of the district court's opinion and the hearing of this appeal, included a moderately lengthy and detailed amendment to the 1934 Act broadly limiting the SEC's regulatory authority over security-based swap agreements.  <u>See</u> Commodity Futures Modernization Act of 2000 §§ 301 & 303.  In particular, that amendment prohibited the SEC from "promulgating, interpreting, or enforcing rules; [] or issuing orders of general applicability" in a manner that "imposes or specifies reporting or recordkeeping requirements, procedures, or standards as prophylactic measures against fraud, manipulation, or insider trading with respect to any [cash-settled total-return

15

equity swap.]"[6] 15 U.S.C. § 78c-1(b)(2).  This amendment

_____

[6] The 2000 Amendment added Section 3A to the 1934 Act, which reads:

§ 78c-1.  Swap Agreements

(a) Non-security-based swap agreement

The definition of "security" in section 78c(a)(10) of this title does not include any non-security-based swap agreement (as defined in section 206C of the Gramm-Leach-Bliley Act).

(b) Security-based swap agreements

(1) The definition of "security" in section 78c(a)(10) of this title does not include any security-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act).

(2) The Commission is prohibited from registering, or requiring, recommending, or suggesting, the registration under this chapter of any security-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act).  If the Commission becomes aware that a registrant has filed a registration application with respect to such a swap agreement, the Commission shall promptly so notify the registrant.  Any such registration with respect to such a swap agreement shall be void and of no force or effect.

(3) Except as provided in section 78p(a) of this title with respect to reporting requirements, the Commission is prohibited from --

(A) promulgating, interpreting, or enforcing rules; or

(B) issuing orders of general applicability;

under this chapter in a manner that imposes or specifies reporting or recordkeeping requirements, procedures, or standards as prophylactic measures against fraud, manipulation, or insider trading with respect to any security-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act).

16

contained exceptions to this prohibition with regard to the

disclosure and disgorgement provisions of Section 16 that, <u>inter

alia</u>, make it clear that a long party's ownership of cash-settled

total-return equity swaps was not to be calculated in determining

beneficial ownership of 10 percent of equity shares.[7]  <u>See</u> 15

> (4) References in this chapter to the
> "purchase" or "sale" of a security-based
> swap agreement (as defined in section 206B
> of the Gramm-Leach-Bliley Act) shall be
> deemed to mean the execution, termination
> (prior to its scheduled maturity date),
> assignment, exchange, or similar transfer
> or conveyance of, or extinguishing of
> rights or obligations under, a security-
> based swap agreement, as the context may
> require.

15 U.S.C. § 78c-1 (as codified).

The Funds argue that Section 3A(b)(2), 15 U.S.C. § 78c-1(b)(2), prohibits the SEC from treating long parties as "beneficial owners" of shares purchased as hedges by short parties.  Given the 2010 amendments discussed in the next paragraph of the text, it is a moot question whether the SEC Rules discussed <u>infra</u> would be beyond its powers if deemed at the time of the district court opinion to render long parties beneficial owners of shares purchased as a hedge by short parties.

[7] Section 16 does not mention equity-based swaps in its definition of persons who are 10 percent beneficial owners subject to Section 16's reporting and disgorgement provisions, 15 U.S.C. § 78p(a)(1), but does require that those beneficial owners disclose purchases and sales of "security-based swap agreement[s]" as well as "equity securit[ies]," and that they disgorge profits from short-swing sales of both.  15 U.S.C. §§ 78p(a)(2)(C), 78p(b); <u>see also</u> Giovanni P. Prezioso, <u>Broker-Dealer Regulation:  The Commodity Futures Modernization Act of 2000</u> (American Law Institute -- American Bar Association Continuing Legal Education, cosponsored by the Federal Bar Association, January 10-11, 2002).  The reason Section 16 omitted security-based swap agreements in determining the 10 percent ownership trigger was that its animating concern is trading and profiting by investors with access to non-public material information.  While actual ownership of shares carries with it voting rights, and therefore power in many cases to obtain such information, security-based swap agreements, without provisions requiring acquisition, disposition, or voting of hedge shares, do not vest the long party with such voting rights and are thus irrelevant to the criteria for crossing the 10 percent ownership threshold.  For investors who do meet Section 16's definition of a 10 percent owner, however, security-based swap agreements offer an opportunity to profit from trading on non-public material

U.S.C. § 78c-1(b)(3).

In 2010, the Dodd-Frank bill not only included security-based swaps in the definition of security but also amended the definition of beneficial owner contained in Section 13 of the SEA.  The provision now states:

> (o) BENEFICIAL OWNERSHIP.--For purposes of this section and section 16, a person shall be deemed to acquire beneficial ownership of an equity security based on the purchase or sale of a security-based swap, only to the extent that the Commission, by rule, determines after consultation with the prudential regulators and the Secretary of the Treasury, that the purchase or sale of the security-based swap, or class of security-based swap, provides incidents of ownership comparable to direct ownership of the equity security, and that it is necessary to achieve the purposes of this section that the purchase or sale of the security-based swaps, or class of security-based swap, be deemed the acquisition of beneficial ownership of the equity security.

Dodd-Frank Wall Street Reform Protection Act § 766(e).  However, the SEC has not exercised its new authority to promulgate rules that specifically reference swaps.  Rather, it has repromulgated Rule 13(d)-3 on the ground that "[a]bsent rulemaking under Section 13(o), [the amendment to Section 13(o)] may be interpreted to render the beneficial ownership determinations

information.  As a result, subjecting swaps to Section 16's reporting and disgorgement provisions was deemed appropriate even though such swaps were excluded from that section's definitional trigger.  Given the Dodd-Frank amendment discussed immediately hereafter in the text, the SEC now has power to include holders of all security-based swaps within the term "beneficial owner."

18

made under Rule 13d-3 inapplicable to a person who purchases or sells a security-based swap." Beneficial Ownership Reporting Requirements and Security Based Swaps, 2011 WL 933460, at *2. The SEC's fear appears to be that, given the prior Congressional bar to its regulating cash-settled total-return equity based swaps, Rule 13d-3 could not apply to such swaps before the amendment and needed repromulgation pursuant to that amendment if the Rule were ever to apply to such swaps.

Two matters of significance must be noted. First, if Rule 13d-3 did not apply to such swaps before the amendment, the district court was wrong in its legal analysis. Second, the repromulgated Rule makes no mention of security-based swaps and in the words of the amendment to Section 13(o) regulates them "only to the extent" that it applies as written.

b) Beneficial Ownership

I turn now to the issue of whether the Funds, as long parties to the cash-settled total-return equity swaps, are beneficial owners of referenced shares bought by short parties to hedge short positions in those swaps. The district court held that if a long party to such a swap would expect that the short party would hedge its position by purchasing shares, then the long party was a beneficial owner of those shares because it "had the power to influence" the purchase. CSX Corp., 562 F. Supp. 2d at 546. The district court further found that the "only

19

practical alternative" for the short parties to hedge was to purchase CSX shares.  Id.

The fact that the purchasing of CSX shares was the "only practical alternative" for short parties to hedge, as found by the district court, is not a circumstance that differentiates the swaps here from cash-settled total-return equity swaps generally. Other hedging methods for short parties exist, but these methods are exceptional.  Henry T.C. Hu & Bernard Black, The New Vote Buying:  Empty Voting and Hidden (Morphable) Ownership, 79 S. Cal. L. Rev. 811, 816, 837 (2006).  Moreover, they also appear to involve derivatives, e.g., swaps, stock options, or stock futures, that may result in the purchasing of referenced shares as a hedge by other parties further down in the chain of transactions.  Id.  The existence of other hedging methods does not affect the analysis, therefore, because the arguments proffered by CSX and the district court are as applicable to these hedge shares as they are to a first short party's purchase of hedge shares.

In any event, a short party's purchasing of shares is the most practical and common method of hedging, and long parties will expect that it will be used, if not by the immediate short party, then by another down the line.  As a result, the district court's ruling renders the long party to virtually all cash-settled total-return equity swaps a "beneficial owner" of such

20

swaps.  Thus, my discussion of the legal meaning of "beneficial owner" will assume that long parties expect short parties to hedge by buying shares.

There appears to be no generally accepted or universal definition of the term "beneficial owner."  Like the term "fiduciary," it is very context-dependent, suggesting no more perhaps than that a power -- <u>e.g.</u>, to vote shares -- or an asset be used for the benefit of the "beneficial owner."  <u>SEC v. Chenery Corp.</u>, 318 U.S. 80, 85-86 (1943) ("But to say that a man is a fiduciary only begins analysis; it gives direction to further inquiry.  To whom is he a fiduciary?  What obligations does he owe as a fiduciary?  In what respect has he failed to discharge these obligations?  And what are the consequences of his deviation from duty?").[8]

_____

[8] Representatives of TCI, in negotiating with CSX and elsewhere, occasionally referred to the swaps as vesting ownership of CSX shares.  Of course, when TCI sought control, its unwinding of swaps and purchasing of shares contradicted these assertions.  Moreover, beneficial ownership is a legal question and such remarks, which add nothing to TCI's rights under the swaps, do not bind a court addressing that legal question.  <u>See</u> <u>Kamen v. Kemper Fin. Servs., Inc.</u>, 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."); <u>Hankins v. Lyght</u>, 441 F.3d 96, 104-05 (2d Cir. 2006) (stating that a court is required to interpret federal statutes as they are written, and is not bound by parties' stipulations of law).

It would be quite anomalous to hold that a swap-holder who makes such a remark is a beneficial owner of the hedge shares while an identical swap-holder who makes no such statement is not such an owner.  Such a rule would, moreover, potentially cause repetitive litigation by creating triable issues based on oral statements in every Section 13(d) case involving swaps.  <u>Cf</u>. <u>Blue Chip Stamps v. Manor Drug Stores</u>, 421 U.S. 723, 743 (1975) (expressing concern that "holder" claims would "throw open to the trier of fact many rather hazy issues of historical fact the proof of which depended almost entirely on oral testimony").

Finally, as discussed <u>infra</u>, TCI's swaps would allow it to profit if it

21

In the present context, there are two SEC rules that apply: Rules 13d-3(a) and 13d-3(b).  <u>See</u> 17 C.F.R. §§ 240.13d-3(a), -3(b).  These Rules were in effect at the time of the district court's decision and, as discussed <u>supra</u>, were repromulgated in 2011 pursuant to the Dodd-Frank amendment to Section 13.

1) Rule 13d-3(a)

SEC Rule 13d-3(a) defines beneficial owner and provides:

> For the purposes of sections 13(d) and 13(g) of the [1934] Act a beneficial owner of a security includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares:
>
> (1) Voting power which includes the power to vote, or to direct the voting of, such security; and/or,
>
> (2) Investment power which includes the power to dispose, or to direct the disposition of, such security.

17 C.F.R. § 240.13d-3(a).

To reiterate, the swap agreements in the instant case do not obligate short parties to purchase shares as a hedge, to sell such shares either at a particular time or to the long party, or to vote those shares as the long party desires.  The issue here is whether, under Rule 13d-3(a), such swaps accord the long party

caused a change in CSX's business plan that increased the value of the company without a control struggle.  The remarks in question may well have been an exaggerated description of that potential benefit.

investment or voting power over the hedge shares when the short party purchases referenced shares as a hedge.

A) Investment Power

CSX argues that it was "inevitable" that TCI's swap counterparties would buy CSX shares to hedge their short swap positions and then would sell those shares when TCI closed out its swaps. Brief of Cross-Appellee at 42. TCI had, CSX concludes, "the economic ability to cause its short counterparties to buy and sell the CSX shares" and therefore had "investment power" over those shares. Id.

CSX asserts that expectations based on the incentives of counterparties to buy and sell shares qualify, for the purposes of Rule 13d-3(a), as the power to "direct the disposition" of those shares. 17 C.F.R. § 240.13d-3(a)(2). I disagree.

Both literally and in the context of the term "beneficial ownership" and Section 13(d)'s concerns over control, this argument gives too much breadth to the term "direct the disposition of." To "direct" something, or to "influence" it, even indirectly, one generally must have some measure of active control, and, in the context of Section 13(d) and swaps, that control must be exercisable in the interests of the long party. See Filing and Disclosure Requirements Relating to Beneficial Ownership, Securities Act Release No. 5925, Exchange Act Release No. 14,692, Investment Company Act Release No. 10,213, 43 Fed.

23

Reg. 18,484, 18,489 (Apr. 28, 1978) (Section 13(d) disclosure is required from any person who has the "ability to change or influence control"); Interpretive Release on Rules Applicable to Insider Reporting and Trading, Exchange Act Release No. 18,114, 46 Fed. Reg. 48,147 n.17 (Oct. 1, 1981) (beneficial ownership under Section 13(d) "emphasizes the ability to control or influence the voting or disposition of the securities").

"Influence" must also be interpreted in the context of Section 13(d)'s concern over control transactions. No one would dream that the author of a weekly column providing stock tips that reliably cause investors to buy and sell the stocks mentioned was the beneficial owner of the shares bought and sold even though the column "influence[d]," not to say caused, the purchases and sales.[9] A relationship that leaves short parties

_____

[9] In the context of swaps, reading "influence" in an unlimited manner would have anomalous consequences. Even in the exceptional case where the short party does not hedge with actual shares, a long party would bear the risk of being found to have "influenc[ed]" the purchase of shares by another unknown party further down the line in the chain of transactions. For example, the short party might hedge its position by entering into a separate swap position with a third party, which, in turn, hedges its own position. Like the initial short party, the third party might purchase actual shares as a hedge or enter into an additional swap agreement or similar derivative position with an additional party, and so on. The initial long party may have no knowledge of the identity or action of the party that ultimately purchases actual shares as a hedge. Moreover, the ultimate share purchaser may have interests in the shares that are in direct opposition to the interests of the initial long party.

Consider, for example, the swap transactions at issue in the 2006 failed buyout offer of Sears Canada by Sears Holding. See In re Sears Canada Inc., et al., 2006 CarswellOnt 6994 (Ont. Secs. Comm. Aug. 8, 2006), aff'd In re Sears Canada, et al., 2006 CarswellOnt 6272 (Ont. Div. Ct. Oct. 11, 2006). Prior to the buyout announcement, hedge fund Pershing Square, L.P. ("Pershing") held an equity position of 5.3 million shares in Sears Canada. Id. ¶ 22. To avoid unfavorable tax consequences relating to a dividend payment by Sears Canada, Pershing, still prior to the buyout announcement, converted its Sears Canada holdings to a derivative position by selling all

24

free to act in whatever way they deem to be in their self-interest with regard to purchases and sales of referenced shares also does not fit within the concept of "beneficial ownership" in the long party. Likewise, a swap agreement that accords complete freedom to the short parties to act in their self-interest with regard to purchases and sales of referenced shares does not confer "beneficial ownership" in the long party in any sense in which those words are commonly used.

Rather, without an agreement or understanding with regard to hedging or unwinding, cash-settled total-return equity swaps leave the short counterparty free to act solely in its self-interest. Absent an agreement or informal understanding committing the banks to buy shares to hedge their CSX-referenced swaps or to sell those shares to the long party when the swaps terminated, the Funds possessed only the power to predict with

---

its shares in connection with entering cash-settled equity swap agreements with SunTrust Capital Markets, Inc. ("SunTrust"). Id. ¶ 22. To hedge its swap agreement with Pershing, SunTrust entered its own swap arrangements with Bank of Nova Scotia ("BNS") and Scotia Capital Markets Group, a BNS subsidiary. Id. ¶¶ 20, 103, 159. In the process, SunTrust arranged the sale of Pershing's Sears Canada shares to BNS. Id. ¶¶ 20, 103. For its part, BNS hedged its swap position with SunTrust by purchasing shares of Sears Canada stock and entering additional offsetting swap agreements. Id. ¶¶ 159, 221.

At the time it entered into its swap agreement with SunTrust, Pershing had no knowledge of which party ultimately purchased its Sears Canada shares, nor did BNS, the purchaser of Pershing's Sears Canada shares, know who had sold them. Id. ¶¶ 59, 103. Ultimately, BNS's interest in its Sears Canada shares was in direct opposition to the interests of Pershing, as evidenced by BNS voting its shares in favor of the buyout offer while Pershing opposed the offer as inadequate. Id. ¶ 52. Nevertheless, one can argue that Pershing, by entering its swap agreement with SunTrust, "influence[d]" the purchase of Sears Canada shares by BNS.

some confidence the purchase of those shares as a hedge, not the power to direct such a purchase, much less to direct those shares' disposition. The long counterparties' act of entering into a swap, therefore, falls well short of "directing" the short counterparties to purchase the stock.

Long counterparties may well expect short counterparties to hedge their swap positions by buying the shares involved in an amount roughly equal to those specified in the swap. However, as noted <u>supra</u>, alternative hedging methods exist and are sometimes used. <u>See, e.g.</u>, <u>Caiola v. Citibank, N.A.</u>, 295 F.3d 312, 315-18 (2d Cir. 2002); Hu & Black, 79 S. Cal. L. Rev. at 816, 837. As noted, <u>see</u> Note 9, <u>supra</u>, these alternative methods may lead to a third party, whose identity is unknown to the long-party, buying hedge shares. Had the banks chosen, for whatever reason, not to hedge their short swap positions with a purchase of shares, not to sell all their hedge shares once the swaps had terminated, to alter their hedging methods and sell the hedge shares before the swaps were unwound, or to sell those shares to a competing would-be acquirer of CSX, the Funds would have lacked any means, legal or moral, to compel the banks to alter that choice or even to inform the Funds of their actions. <u>See</u> Hu & Black, 79 S. Cal. L. Rev. at 839. Thus, the sort of power that CSX attributes to the Funds does not fit within the language "to direct the disposition" of the CSX shares. 17 C.F.R. § 240.13d-3(a)(2).

26

CSX recognizes the need to establish a nexus between influencing a sale of the short party's hedge shares upon unwinding and the long party's control ambitions by arguing that, in the inducing of those sales, the Funds exercised investment power by "materially facilitat[ing] [the Funds'] rapid and low-cost acquisition of a physical position upon the termination of the swaps." Brief of Cross-Appellee at 43. Whether or not the alleged "material facilitation" would run afoul of the Reliance Electric test, see supra, or would provide a sufficient nexus to the term "investment power" to constitute "beneficial ownership," 17 C.F.R. § 240.13d-3(a)(2), the "material facilitation" claimed here substantially overstates the effect of acquiring long positions in cash-settled equity swaps.

Cash-settled equity swaps allow the short party to retain its hedge shares or dispose of them at the highest price available. Thus, the long party's choices for acquiring actual shares in the referenced company are either to go into the open market or to pay the short party no less than the open market price.

Buying or selling by the short party may affect the availability and price of shares, but hardly constitutes the claimed "material facilitation."[10]  If the market for the shares

_____

[10] In analyzing "material facilitation" purely in terms of the effect of swap transactions on the ability to purchase shares, I am simply addressing the argument that CSX has raised before us. As I discuss, infra, persons may

27

is liquid, as will often be the case, then rapid acquisition of those shares would be possible regardless of the sale of shares used to hedge swap positions. Thus, such a sale would have little practical effect on the long party's ability to acquire shares. If the market is highly illiquid, then potential short parties would find it very costly to acquire the shares and thus either would not acquire shares to hedge their short swap positions or, more likely, would refuse to enter into such swap agreements.[11]

If the market's illiquidity is more moderate, then closing out swap agreements may provide a degree of confidence that a block of shares will go on the market. However, purchasing this confidence will be very expensive, because keeping individual short parties under Section 13(d)'s 5 percent threshold may

_____

choose to acquire long equity swap positions for reasons other than acquiring shares when the swap positions unwind.

[11] If markets are highly illiquid, then purchasing shares to hedge short swap positions will most likely either be impossible or prohibitively expensive. Moreover, the frequent absence of a market price in a highly illiquid market is likely to discourage the creation of standard equity swap agreements for lack of an objective means of calculating the cash flows required by changes in the referenced asset's value. Under such circumstances, a bank would enter into a short swap position only if it were willing either to accept the risks of an unhedged short exposure or to hedge its short exposure by some means other than purchasing shares. (Of course, a bank might simply refuse to enter such an agreement at all, in light of the hedging difficulties.) In any case, acquisition of large quantities of hedge shares by a short swap counterparty in such a market would be highly unlikely. Moreover, because a highly illiquid market is typically one in which the vast majority of shares are held by only a small number of owners, takeovers via the medium of cash tender offers in the open market -- the core concern of the Williams Act -- are likely to be rare anyway.

require using several short counterparties, who will be competing with each other for limited available shares and will pass the resulting increased hedging costs on to the prospective long party.  Moreover, if the long party's purpose is to ensure the availability of shares when making its acquisition move, the ultimate effect of these swap stratagems may be only to reduce market illiquidity for a competing acquirer -- perhaps an acquirer that is in league with the firm's management or even management itself -- who, having avoided the costs of the swaps, will be better positioned to make its own bid.

Moreover, cash-settled total-return equity swaps will not lower a long party's costs of acquisition.  The basis for CSX's claim that these swaps allow long parties to acquire shares at a low price is unclear.  It may be based on the belief that unwinding the swaps will momentarily increase the market supply of shares and thus lower those shares' market price.  However, if the swap unwinding is likely to lower the prices of the referenced shares, then the short party, who, as a seller, will suffer from that downward slippage in prices, will insist on passing those foreseeable extra hedging costs along to the long party in the form of higher "interest" payments, leaving long parties on the average in much the same (or worse) economic position as if they had simply bought the shares directly, without a detour through a cash-settled equity swap position.  In

29

other words, cash-settled total-return equity swaps, without more, are not a substitute for the ownership of shares by parties seeking to control a corporation.  Control still requires the purchase of shares on the open market, <u>as happened in the instant case</u>, or from the short party at the open market price, thus causing the party seeking control to bear the costs of both the swaps and the shares.

In the absence of some other agreement governing the disposition of shares purchased to hedge a swap position, merely having a long position in a cash-settled total-return equity swap does not constitute having the power, directly or indirectly, to direct the disposition of shares that a counterparty purchases to hedge its swap positions, and thus does not constitute having "investment power" for purposes of Rule 13d-3(a).  17 C.F.R. § 240.13d-3(a)(2).

B) Voting Power

The district court found no evidence of explicit agreements between TCI and the banks committing the banks to vote their shares in a specified way.  <u>CSX Corp.</u>, 562 F. Supp. 2d at 543. Nevertheless, CSX argues that TCI's ability to select counterparties gave it "voting power," 17 C.F.R. § 240.13d-3(a)(1), over the counterparties' hedge shares.

In fact, TCI eventually consolidated its swap holdings in Citibank and Deutsche Bank.  TCI "hope[d] that Deutsche Bank

30

would vote in [TCI's] favor" because a hedge fund internal to Deutsche Bank, Austin Friars, also had investments in CSX. Brief of Cross-Appellee at 45-56. CSX argues further that when TCI chose its other swap counterparties, it selected banks that it knew were "sympathetic to [its] voting objectives." Id. at 46 n.26. CSX concedes that some of these counterparties had policies that prohibited them from voting their shares but argues that the effective removal of these counterparties' shares from the voting pool left TCI in a better position than if the votes of those shares had been left to chance. I disagree on both counts.

That a short party's self-interest predisposes it to vote in favor of positions taken by a prospective long counterparty is insufficient, on its own, to show a transfer of voting power to the long counterparty for purposes of Section 13(d) and Rule 13d-3(a)(1). To hold otherwise would distort both the term "beneficial owner" and the word "power." A short party's self-interest is not an obligation to vote as the long party would desire. Nor is it a right in the long party to compel the short party to vote in a particular way.[12] Indeed, were another putative acquirer to appear in competition with the long party,

_____

[12] As my discussion of the formation of a "group" indicates, see infra, if the long party has an agreement with the short party as to the voting of shares purchased as a hedge, the shareholdings of both parties would be aggregated for purposes of tallying the percentage of shares held by beneficial owners.

31

the long party might well find that the short party's self-interest was now at odds with its own.  See Hu & Black, 79 S. Cal. L. Rev. at 839.

Purchases by a short party with a policy against voting shares held solely as a hedge will not increase the voting power of a long party's shares.  Abstaining can have influence only with regard to shares that, if not purchased by a short party as a hedge, would have been voted against the wishes of the long party.  Because the hypothetical voting intentions of persons from whom the abstaining short parties purchased their shares on the open market are unknown, this asserted influence over shareholder votes is entirely speculative and hardly qualifies as voting "power."

The facts that the Funds "hoped" that Deutsche Bank would vote in the desired way, or that the Funds entered into cash-settled equity swap agreements with counterparties believed to be inclined to vote as the Funds desired, do not constitute the requisite power to direct the counterparties' vote.  See 17 C.F.R. § 240.13d-3(a)(1).  Indeed, the facts indicate the opposite:  when TCI realized that it needed to exercise control and decided to wage a proxy battle, it started unwinding its swaps and buying shares in order to vote the shares as it pleased, indicating that the Funds' swap positions did not give the power, directly or indirectly, to "direct the voting" of the

32

counterparties' CSX shares.  Id.

Finally, I note that my conclusion parallels Congress's earlier decision to exclude security-based swaps in determining whether a party is a 10 percent beneficial owner, for purposes of Section 16, triggering its reporting and disgorgement provisions, while requiring 10 percent owners to report security-based swap holdings and to disgorge short-swing profits in trading them. See supra note 7.

2) Rule 13d-3(b)

While Rule 13d-3(a) sets forth the criteria for beneficial ownership of a security, Rule 13d-3(b) sets forth criteria for being "deemed" such a beneficial owner:

> Any person who, directly or indirectly, creates or uses a trust, proxy, power of attorney, pooling arrangement or any other contract, arrangement, or device with the purpose of [sic] effect of divesting such person of beneficial ownership of a security or preventing the vesting of such beneficial ownership as part of a plan or scheme to evade the reporting requirements of section 13(d) or (g) of the [1934] Act shall be deemed for purposes of such sections to be the beneficial owner of such security.

17 C.F.R. § 240.13d-3(b).

Rule 13d-3(b) is one of a large number of historical and contemporary rules and regulations, or preliminary notes to them, that seek to prohibit "plan[s] or scheme[s] to evade" statutory

33

provisions or SEC rules and regulations.[13]  The purpose of such

"evasion provisions" is to effectuate statutory policies where

SEC rules or regulations may not literally cover an unforeseen

structure of a transaction or the creation of unforeseen

instruments that fall within the regulated area but outside the

literal terms of the pertinent regulatory provisions.

---

[13] For example, each of former Rules 146, 240 and 242, which provided registration exemptions for, inter alia, privately placed securities, included a preliminary note stating that technical compliance with the rule would not assure the exemption if the securities transaction was "part of a plan or scheme to evade the registration requirements of the Act."  See Notice of Adoption of Rule 146, Securities Act Release No. 5487, 1974 WL 161966, *5 (May 7, 1975); Notice of Adoption of Rule 240, Securities Act Release No. 5560, 1975 WL 160968, *3 (Jan. 24, 1975); and Exemption of Limited Offers and Sales by Qualified Issuers, Securities Act Release No. 6180, 1980 WL 29335, *13 (Jan. 17, 1980).

Evasion provisions remain prevalent in the SEC's current rules and regulations.  Regulation D, which, among other things, replaced Rules 146, 240 and 242, see Revision of Certain Exemptions from Registration, Securities Act Release No. 6389, 47 Fed. Reg. 11,251-01 (Mar. 16, 1982), includes an evasion provision stating that "regulation D is not available to any issuer for any transaction or chain of transactions that, although in technical compliance with these rules, is part of a plan or scheme to evade the registration provisions of the Act."  17 C.F.R. §§ 230.501 - .508 n.6.  A nearly identical evasion provision appears in each of current Rule 144, 17 C.F.R. § 230.144 n.2 (exempting registration for sales of restricted or control securities), Rule 144A, 17 C.F.R. § 230.144A n.3 (exempting registration for sales to Qualified Institutional Buyers), Rule 147, 17 C.F.R. § 230.147 n.3 (exempting registration for intra-state issuances), Regulation S, 17 C.F.R. §§ 230.901 - .904 n.2 (exempting registration for offers and sales outside the United States), and Rule 701, 17 C.F.R. § 230.701 n.5 (exempting from registration sales of securities pursuant to employment compensation plans).

Rule 10b5-1(c) provides an affirmative defense to insider trading charges for trades made pursuant to written plans for the sale of securities by corporate insiders who may have material nonpublic information.  17 C.F.R. § 240.10b5-1(c)(1)(i).  However, the affirmative defense is available only when the plan to purchase or sell securities was "given or entered into in good faith and not as part of a plan or scheme to evade prohibitions of this section."  17 C.F.R. § 240.10b5-1(c)(1)(ii).  Other rules with evasion provisions include Rule 10b-18, 17 C.F.R. § 240.10b-18 n.1 (exempting certain issuer repurchases from market manipulation rules), Rule 167, 17 C.F.R. § 230.167 note (exempting certain communications in connection with asset backed securities from dissemination restrictions under Sections 5(c) and 2(a)(10)), and Rule 168, 17 C.F.R. § 230.168 n.1 (exempting forward looking and factual business information from the dissemination restrictions under Sections 5(c) and 2(a)(10) of the Act).

Evasion provisions are catch-all methods of closing unforeseen "loopholes" that seek to use form to evade substance or to comply with technicalities while violating the "spirit" or intent of regulatory provisions. As such, there are two important points to be made about them. First, evasion provisions do not expand the permissibly regulable area. Second, they are not subject to the canon of construction that a statutory or regulatory provision must be read to have effect and is not superfluous. New York State Restaurant Ass'n v. New York City Bd. of Health, 556 F.3d 114, 130 n.17 (2d Cir. 2009) (quoting APW v. Potter, 343 F.3d 619, 626 (2d Cir. 2003)) ("A basic tenet of statutory construction, equally applicable to regulatory construction, is that a text should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant, and so that one section will not destroy another unless the provision is the result of obvious mistake or error.") Evasion provisions may be superfluous in actual practice because there are no loopholes.

There is no contention that the Funds' cash-settled total-return equity swap arrangements had the purpose or effect of "divesting," 17 C.F.R. § 240.13d-3(b), TCI of beneficial ownership of the CSX shares that TCI's counterparties purchased. Therefore, the issue under Rule 13d-3(b) is whether those swap arrangements had the purpose or effect of "preventing the

35

vesting," id., of beneficial ownership in the short parties'

hedge shares.

Rule 13d-3(b) must be read in the context of both Section

13(d), which provides the underlying authority for the Rule's

promulgation, and of Section 16, as discussed at length supra.

As that discussion indicated, a person or group triggers

obligations under Sections 13 and 16 by conduct.

At one end of a spectrum of relevant conduct raising Section

13(d) issues, a party, or parties to a group, may decide to take

steps toward the acquisition of a company.  As noted above, they

may plan to buy a significant block of shares well in excess of 5

percent.  They may buy 4.9 percent of the company's shares but

stop there solely to avoid disclosure.  They may arrange

financing[14] and make preliminary inquiries of large shareholders

that may facilitate the rapid acquisition of shares once the

desired moment to strike has arrived and before the ten-day

disclosure period has expired.  None of this triggers Section

13(d) disclosure until ten days after the 5 percent threshold has

---

[14] Arrangements to line up financing for stock acquisitions might trigger Section 13(d)'s "group" provisions with respect to the lender and the borrower, depending upon the specific circumstances and conditions of the financing.  See, e.g., Roth v. Jennings, 489 F.3d 499, 502, 511-13 (2d Cir. 2007) (holding that dismissal of a Section 16 suit for disgorgement of short-swing profits was unjustified when there were allegations that a loan had been made to a borrower in furtherance of an agreement between the lender and the borrower "to work together to effect a change of control or similar transaction involving [the company whose shares were purchased with the borrowed money]") (internal quotation marks omitted).

36

been passed, despite being steps in pursuit of an acquisition and fully designed literally to prevent the vesting of ownership of 5 percent in order to avoid disclosure.

At the other end of the spectrum, a party or group contemplating acquisition of a company may provide funds to another party or parties to buy shares with the understanding that the buyer(s) will retain them in the buyer's name, to be conveyed to the would-be acquirer when so directed and without the nominal buyer(s) bearing any risk.  Whether or not various aspects of such a transaction would be legally enforceable, such a sham would trigger the disclosure requirements of Section 13(d) if the shares held by the parties in the aggregate exceeded 5 percent.  In this example, the understanding between the parties places the ostensible seller comfortably within the meaning of the term "beneficial owner," because the buyer has obligated itself to retain the shares in order to reconvey them to the seller.  (The underlying contract would also make the party behind the scheme part of a "group" with the buyer, as discussed infra.)  In my view, the Funds' cash-settled equity swap agreements with the banks fall closer to the first hypothetical on the spectrum for purposes of Section 13(d).

Again, for the Funds to be "deemed" a beneficial owner under Rule 13d-3(b) there must be evidence both that their purpose in entering the CSX-referenced swap agreements was to "prevent" the

37

vesting of beneficial ownership and that the intended prevention was part of a plan or scheme to "evade," 17 C.F.R. § 240.13d-3(b), the Section 13(d) disclosure requirements.

The district court found "overwhelming" evidence that the Funds entered into the swap agreements "at least in major part, for the purpose of preventing the vesting of beneficial ownership of CSX shares in TCI and as part of a plan or scheme to evade the reporting requirements of Section 13(d). . . ." CSX Corp., 562 F. Supp. 2d at 548-49. The district court rested this conclusion upon the following evidence: (i) TCI's chief financial officer once said that a reason to use swaps is that they provide "the ability to purchase without disclosure"; (ii) TCI emails had discussed the need to limit the size of swap agreements with individual counterparties in order to avoid those counterparties' having to disclose their holdings of shares purchased for hedging purposes;[15] (iii) TCI acquired only 4.5 percent of CSX's shares -- below Section 13(d)'s 5 percent reporting threshold -- until TCI was ready to disclose its position; and (iv) TCI admitted that one of its motivations for avoiding disclosure by its swap counterparties was a concern that disclosure would drive up the market price of CSX shares and thus increase TCI's cost of

---

[15] I do not disagree with the district court's analysis. I note, however, that a long party has no interest in putting a short party under a Section 13(d) disclosure obligation. Such disclosure is costly to the short party, and the costs will be passed on to the long party.

38

purchasing CSX shares later.  Id. at 549.

Conduct violating Rule 13d-3(b) must also include a plan or scheme to "evade" the Section 13(d) reporting requirements.  17 C.F.R. § 240.13d-3(b).  The district court concluded that TCI's purchases were part of such a plan or scheme to evade.  CSX Corp., 562 F. Supp. 2d at 549.  It stated that "no one suggests that TCI did nothing more than enter into an equity swap," and that "[a]t a minimum, it entered into the [cash-settled total-return equity swap agreements] rather than buying stock for the purpose, perhaps among others, of avoiding the disclosure requirements of Section 13(d) by preventing the vesting of beneficial ownership in TCI."  Id. at 550 (internal quotation marks omitted).

This view of "evasion" under Rule 13d-3(b) is extraordinarily expansive.  To be sure, TCI wanted to avoid disclosure and constrained its trading activities accordingly. In fact, the intent to avoid disclosure under Section 13(d) is ubiquitous.  Quite apart from wanting to conceal acquisition tactics, a desire to avoid the expense of disclosure is inevitable.  But "preventing" the vesting of beneficial ownership in shares must mean more than what the district court described. At a minimum, the transaction must include a component that provides a substantial equivalence of the rights of ownership relevant to control, or include steps that stop short of, or

39

conceal, the vesting of ownership, while nevertheless ensuring that such ownership will vest at the signal of the would-be owner.  Conduct lacking such a component or steps does not violate the statute even when fully intended to avoid disclosure. Reliance Elec., 404 U.S. at 422 ("Liability cannot be imposed simply because the investor structured his transaction with the intent of avoiding liability under § 16(b).").

The district court's rationale depended so heavily on the Funds' intent to avoid disclosure that it found it unnecessary to decide whether cash-settled total-return equity swaps constituted the equivalence of beneficial ownership of shares absent a desire not to disclose.  CSX Corp., 562 F. Supp. 2d at 545-48. (The district court strongly implied that it did.)  It simply held that such swaps prevented the vesting of beneficial ownership -- a characteristic common to all non-purchasing acts -- and was intended to avoid disclosure -- an everpresent state of mind.  Id. at 551-52.  The intent to avoid disclosure cannot constitute a violation of the statute when the underlying transaction does not provide the party with the substantial equivalence of the rights of ownership relevant to control.  That is clearly the meaning of Reliance Electric.

I am aware of no SEC guidance establishing the meaning of "evade" in Rule 13-3(b), nor has our caselaw addressed the issue. In applying evasion provisions, the Commission appears to borrow

40

doctrine from the tax evasion context, in particular, the business purpose and substance over form doctrines.  See generally Gregory v. Helvering, 293 U.S. 465 (1936) (holding that when the form of a transaction does not comport with its substance, the substance of the transaction controls for tax liability purposes).  For example, in what is perhaps its earliest interpretive guidance, the Commission suggested that a transaction would be interpreted as an attempt to evade registration requirements under the Act if it was not deemed "bona fide," even if it "might comply with the literal conditions of [the Act]."  Letters of General Counsel Discussing Application of Section 3(a)(9), Securities Act Release No. 646, 1936 WL 31995, at *2 (Feb. 3, 1936) (citing Gregory v. Helvering, 293 U.S. 465 (1936)).

Similar analyses can also be seen in more recent Commission statements.  For example, in a 1995 release concerning Regulation S, the Commission stated that the pertinent evasion provision would preclude an exemption under Regulation S where factors indicated that "the economic or investment risk never shifted to the offshore purchaser, and that the securities -- as a matter of substance as opposed to form -- never left the United States. . . ."  Problematic Practices Under Regulation S, Securities Act Release No. 7190, 60 Fed. Reg. 35,663, 35,664 (Jul. 10, 1995).  In a 2002 adjudication, the Commission stated that "Regulation S

41

shelters only <u>bona fide</u> overseas transactions; it is not a haven for any foreign stock distribution that is part of a plan to evade the registration provisions of the Securities Act." <u>In re Weeks</u>, Initial Decision Release No. 199, 2002 WL 169185, at *34 (Feb. 4, 2002) (emphasis in original), <u>aff'd</u>, <u>In re Hesterman</u>, Securities Act Release No. 8139, Exchange Act Release No. 46,703, 2002 WL 31374801 (Oct. 22, 2002). Similarly, in addressing the applicability of the evasion provision under Rule 144A, the Commission stated that the provision applies when "the substance of a transaction is contrary to the Rule even though the transaction is structured so as to comply with the Rule's technical requirements, such as when the transaction is a sham designed to create the illusion that it should be exempt." Letter from Jacob H. Stillman, Solicitor, Office of the Gen. Counsel of the SEC, to Hon. Karon O. Bowdre, U.S. Dist. Court for the N. Dist. of Ala. (Nov. 28, 2006), <u>In re Healthsouth Sec. Litig</u>., No. CV-03-BE-1500-S (N.D. Ala.), at 8.

In sum, as pertinent to the instant matter, evasion provisions may apply where a transaction, while in technical compliance with a rule, still evades its underlying policies. For example, the SEC staff has stated that "it does not seem to us to be necessarily sinister to [avail oneself] of a valid registration exemption . . . so long as the public policy . . . as expressed in the Act is not frustrated." Hamelly Indus., SEC

42

No-Action Letter, 1976 WL 10536, at *3 (Nov. 29, 1976).

Evasion provisions must be read in light of the underlying statutory or regulatory provision. As explained above, there are many perfectly legal methods of intentionally avoiding disclosure under Section 13(d). Section 13(d) is designed to compel disclosure of holdings involving 5 percent beneficial ownership interests. It does not require disclosure of control ambitions absent such holdings. In that light, "evasion" suggests a transaction with the ownership characteristics and benefits intended to be regulated, or steps to create a false appearance of the transaction or the persons entering into it,[16] to avoid compliance with the regulation's reporting requirements. See Letter from Brian V. Breheny, Deputy Dir., SEC Div. of Corp. Fin., as Amicus Curiae to Hon. Lewis A. Kaplan, U.S. Dist. Court for the S. Dist. of N.Y. (June 4, 2008), CSX Corp. v. The Children's Inv. Fund Mgmt, L.L.P., et al., Doc. No. 08-cv-2764, at 3.

If the transaction under scrutiny does not have substantially the characteristics or expected benefits that are intended to be regulated, then an evasion provision simply does not apply. Evasion of Section 13(d), 15 U.S.C. § 78m(d), is not present in cash-settled total-return equity swaps because the

---

[16] Because my reasoning does not rely on the creation of a false appearance, I do not reach the role of such conduct under Rule 13d-3(b).

43

swaps themselves provide no means of exercising control. As explained in the discussion of Rule 13d-3(a), an owner of such swaps cannot seek to exercise control without buying the actual shares in an open competitive market. In the present case, when the Funds could not persuade CSX to change its policies, they had to make actual purchases of CSX stock, a step that would have been unnecessary if the swaps they held were the substantial equivalent of beneficial ownership.

It is also critical to note that the swaps here were not sham transactions creating a false appearance while lacking economic substance. Long counterparties to such swaps have legitimate economic purposes. As the district court found with regard to TCI, the swaps would enable TCI to reap a leverage-amplified profit if CSX's management, faced with the Funds' potential challenge, instituted new policies that increased the value of the company. CSX Corp., 562 F. Supp. 2d at 522, 527. If that occurred, a successful insurgent proxy fight or other control transaction would have been precluded, but TCI would share in the increased value resulting from its efforts. Similarly, if competing bidders appeared with a higher price for the company, TCI would share in the increased share price.

Finally, my view does no substantial damage to underlying statutory policies; indeed, it effectuates them. As noted, swaps are not instruments that have escaped Congress's attention and

are a poor candidate for being labeled an unforseen device used to evade congressional purpose.

To the contrary, at the time of the district court's decision, the 2000 Act not only exempted security-based swaps from the securities laws definition of a regulable "security" but also "prohibited" the SEC from regulating security-based swaps in the extraordinarily broad language quoted supra. See supra note 6. Congress's then perception of a lack of an equivalence between cash-settled total-return swaps and ownership of the underlying securities was further demonstrated by Section 16's exclusion of such swaps from the calculation of the 10 percent disgorgement trigger but inclusion in the calculation of profits from short-swing trades. That scheme recognizes that ownership rights do not attach to swaps and therefore such swaps cannot afford access to inside information. See supra note 7. Given that by statute swaps could not then be counted in calculating Section 16's disgorgement trigger for the long party, it was a bold step indeed for the district court to hold that shares purchased and owned by the short party as a hedge were to be counted as owned by the long party because swaps "evade" the statutory purpose.

The situation is not much different today. While the SEC now has authority to regulate security-based swaps, it has simply repromulgated Rule 13d-3. For the reasons stated, this hardly

45

justifies a court treating cash-settled total-return swaps as an evasion of Section 13(d).

c)  "Group" Formation

I turn now to the issue of group formation, which governs the determination of which of the many participants in the events described above may be subject to Section 13(d)'s disclosure requirements.

Rule 13d-5(b)(1) provides that the Section 13(d) disclosure requirements apply to the aggregate holdings of any "group" formed "for the purpose of acquiring, holding, voting or disposing" of those securities.  17 C.F.R. § 240.13d-5(b)(1).

Many of the concerns about the use of swaps to avoid Section 13(d)'s disclosure requirements are allayed by the group concept. Any agreement or understanding between various funds for the purposes set out in Rule 13d-5(b)(1) would cause the aggregation of shares beneficially owned by each member of the group for purposes of Section 13(d).  Also, any agreement or understanding between long and short swap parties regarding:  (i) the purchase of shares by the short party as a hedge; (ii) the sale of such shares to the long party when the swaps are unwound (as in settled-in-kind equity swaps); or (iii) the voting of such shares purchased by the short party, would cause the shares purchased as a hedge and any shares owned by the long party to be aggregated and counted in determining the 5 percent trigger.  (Of course, as

46

discussed <u>supra</u>, such an understanding might also render the long

party a "beneficial owner" under Rule 13d-3(a).  <u>See</u> 17 C.F.R. §

240.13d-3(a).)[17]

With respect to whether there was such an agreement or

understanding between the Funds, the district court found that

---

[17] This application of Section 13(d)'s "group" provisions to equity
swaps was not precluded at the time of the district court's decision by
Section 3A's general prohibition of most SEC regulation of security-based
swaps.  The pertinent part of Section 3A, 15 U.S.C. 78c-1(b), explicitly
adopts the definition of "security-based swap agreement" provided by Section
206B of the Gramm-Leach-Bliley Act, which in turn incorporates the definition
of "swap agreement" provided by Section 206A of that Act.  15 U.S.C. §§ 78c-
1(b), 78c note.  Section 206A's definition explicitly excludes:

> (1) any put, call, straddle, option, or privilege on
> any security, certificate of deposit, or group or
> index of securities, including any interest therein or
> based on the value thereof;
> . . .
> (3) any agreement, contract, or transaction providing
> for the purchase or sale of one or more securities on
> a fixed basis;
> (4) any agreement, contract, or transaction providing
> for the purchase or sale of one or more securities on
> a contingent basis, unless such agreement, contract,
> or transaction predicates such purchase or sale on the
> occurrence of a bona fide contingency that might
> reasonably be expected to affect or be affected by the
> creditworthiness of a party other than a party to the
> agreement, contract, or transaction . . . .

15 U.S.C. § 78c note; <u>see also</u> Giovanni P. Prezioso, <u>Broker-Dealer Regulation:</u>
<u>The Commodity Futures Modernization Act of 2000</u> (American Law Institute --
American Bar Association Continuing Legal Education, cosponsored by the
Federal Bar Association, January 10-11, 2002).  As I noted <u>supra</u>, the economic
position of a party to a cash-settled equity swap is identical to the economic
position of a party to an equity swap that is settled in kind.  The latter,
however, gives the long swap party an additional right, not shared by the rest
of the market, to acquire directly from the short party the shares referenced
by the equity swap.  Such extra agreements concerning purchases and sales
clearly bring in-kind-settled equity swap agreements under the Section 206A
exclusion from Section 3A's prohibition on SEC regulation.  Likewise, an
agreement between the long and short swap parties about the voting of hedge
shares is not itself properly characterized as a swap agreement, as Section
206A defines that term, and therefore Section 3A places no obstacle in the way
of finding that such a voting agreement can create a "group" for purposes of
Section 13(d).

TCI and 3G formed a group with respect to CSX securities no later than February 13, 2007.  CSX Corp., 562 F. Supp. 2d at 555.[18]

As noted by my colleagues, the district court enumerated the circumstances, "including the existing relationship, the admitted exchanges of views and information regarding CSX, 3G's striking patterns of share purchases immediately following meetings with [TCI officials], and the parallel proxy fight preparations" that persuaded it to find that TCI and 3G had formed a group by February 13, 2007.  Id. at 553–55.

The district court's finding as to the formation of a group between TCI and 3G in February 2007 cannot be upheld without adopting the district court's legal conclusions regarding swaps. It was necessarily based in part on the premise that TCI's purchase of swaps rendered TCI a beneficial owner of shares bought by the short parties as a hedge.  It was that premise that led the court to conclude that TCI's goal in February 2007 was at that time to seek control of CSX through the use of swaps. Indeed, on February 13, 2007, TCI and 3G did not own in the

---

[18] With respect to a group involving both long and short parties, the district court noted that TCI had communications with Deutsche Bank and with one of Deutsche Bank's hedge funds, Austin Friars, which held a substantial amount of CSX stock.  CSX Corp., 562 F. Supp. 2d at 530.  The court noted that these communications (in 2008) might be sufficient to create a group under Rule 13d-5(b)(1), 17 C.F.R. § 240.13d-5(b)(1), but did not resolve the question.  Id. at 543-45.
However, with this one exception, there is no evidence that the Funds had any understanding with any of the banks regarding the purchase of CSX shares, the sale of such shares to the Funds when the swaps were unwound, or the voting of such shares.

aggregate 5% of CSX's actual shares.

The district court's finding of a group also suffers from a second error. That finding was that "the parties activities from at least as early as February 13, 2007, were products of concerted action." Id. However, Rule 13d-5(b)(1) applies only to groups formed "for the purpose of acquiring, holding, voting or disposing" of "securities" of the target firm. The Rule does not encompass all "concerted action" with an aim to change a target firm's policies even while retaining an option to wage a proxy fight or engage in some other control transaction at a later time. Indeed, the Rule does not encompass "concerted action" with a change of control aim that does not involve one or more of the specified acts.

The overwhelming evidence is that TCI, while understanding that a hostile proxy fight might ultimately be necessary, first sought to change CSX's policies without a control change and to profit through swaps. In fact, TCI was negotiating with CSX management at the end of March, and the strongest evidence relied upon by the district court in support of the TCI-3G group finding was the "parallel proxy fight preparations," which occurred in "late September-October 2007." CSX Corp., 562 F. Supp. 2d at 553-54. The finding of a group formation in February 2007 is, therefore, flawed.

There are only two pieces of evidence supporting the

49

February 2007 finding.  One is the fact of the relationship between TCI and 3G -- a 3G affiliate was an investor in TCI.  The other is that, on two occasions, 3G purchased shares after conversations with TCI.  These are the only concrete acts relied upon by the district court that might reflect a February 2007 agreement requiring aggregation of TCI/3G shareholdings.

As to the ongoing relationship between TCI and 3G, it surely demonstrates an opportunity to form a "group," but it also provides an explanation for frequent conversations that do not involve CSX.  With regard to 3G's purchases of stock, there is no claim that TCI increased its shareholdings at the same time, that is, no evidence of "concerted action" in buying actual shares.  In fact, there is no evidence whatsoever that 3G's and TCI's purchases of CSX stock were coordinated in February 2007.  Indeed, the district court found that, at this time, TCI was informing other funds of TCI's interest in altering CSX's business plans in the hope of "steer[ing] CSX shares into the hands of like-minded associates."  CSX Corp., 562 F. Supp. 2d at 553.  There is no evidence that 3G's purchases at this time were more than the result of this sharing of information, which hardly amounts to an agreement to buy CSX shares.

The finding of a "group" owning 5% of CSX shares in February 2007 is clearly erroneous, and I concur in order to seek clarification on a remand.

50

CONCLUSION

I therefore concur in the result.  I add a final word, a relief to any reader who got this far.  The issue here is not fact specific.  Total-return cash-settled swap agreements can be expected to cause some party to purchase the referenced shares as a hedge.  No one questions that any understanding between long and short parties regarding the purchase, sale, retention, or voting of shares renders them a group -- including the long party -- deemed to be the beneficial owner of the referenced shares purchased as a hedge and any other shares held by the group. Whether, absent any such understanding, total-return cash-settled swaps render a long party the beneficial owner of referenced shares bought as a hedge by the immediate short party or some other party down the line is a question of law not fact.  At the time of the district court opinion, the SEC had no authority to regulate such "understanding"-free swaps.  It has such authority now, but it has simply repromulgated the earlier regulations. These regulations, and the SEC's repromulgation of them, offer no reasons for treating such swaps as rendering long parties subject to Sections 13 and 16 based on shares purchased by another party as a hedge.  Absent some reasoned direction from the SEC, there is neither need nor reason for a court to do so.